ACCEPTED
03-14-00722-CR
7572323
THIRD COURT OF APPEALS
AUSTIN, TEXAS
10/28/2015 9:55:24 AM
JEFFREY D. KYLE
CLERK

## Nos. 03-14-00722-CR; 03-14-00723-CR; 03-14-00724-CR

In the Court of Appeals for the Third District
Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
10/28/2015 9:55:24 AM
JEFFREY D. KYLE
Clerk

**Mark Fruge,**
Appellant

v.

**The State of Texas,**
Appellee

Appeal from the 331st Judicial District Court
Travis County, Texas
Cause Numbers D-1-DC-13-200256; D-1-DC-13-200257;
D-1-DC-13-200259
Honorable Judge David Crain, Presiding

## STATE'S BRIEF

**Rosemary Lehmberg**
District Attorney
Travis County, Texas

**Matthew Foye**
Assistant District Attorney
State Bar No. 24043661
P.O. Box 1748
Austin, Texas 78767
512-854-9400 (phone)
512-854-4810 (fax)
Matthew.Foye@traviscountytx.gov
AppellateTCDA@traviscountytx.gov

*Oral argument is not requested*

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................... iv

STATEMENT REGARDING ORAL ARGUMENT ..................... vi

NOTE CONCERNING ABBREVIATIONS ............................. vi

STATEMENT OF THE CASE................................................ vi

STATEMENT OF FACTS ................................................... 1

SUMMARY OF THE STATE'S ARGUMENT ........................... 7

STATE'S ARGUMENT ...................................................... 8

Reply to Point One ....................................................... 8

   The trial court did not err in granting the State's challenge for
   cause because the veniremember said he would hold the State to
   a higher burden of proof than required by law. ......................... 8

      Beyond a Reasonable Doubt ............................................. 9

      Appellant's Case Law Inapplicable..................................... 11

      Any Error Was Harmless................................................. 12

Reply to Point Two ...................................................... 14

   The trial court did not err in admitting evidence of a bad act by
   Appellant because the bad act was same-transaction contextual
   evidence. .................................................................. 14

      Admissible as Same–Transaction Contextual Evidence......... 15

      Admissible as Evidence of Flight ...................................... 18

      Admissible as Evidence of Intent ...................................... 20

      Admissible as Evidence of Identity.................................... 22

      Admissible Under Tex. R. Evid. 403 Balancing Test ............ 23

      Any Error Was Harmless................................................. 25

         Appellant's Trial Strategy Was Successful....................... 26

         Little Time Spent Developing Evidence........................... 28

         No Unfair Surprise or Lack of Notice.............................. 29

         Overwhelming Evidence of Guilt.................................... 30

         No Risk of Undue Punishment ...................................... 31

Conclusion ........................................................... 32

PRAYER ................................................................. 33

CERTIFICATE OF COMPLIANCE AND SERVICE ................. 34

Veniremember 12's Responses ............................. Appendix A

Opinion: *Devoe v. State,* 354 S.W.3d 457 ..................... Appendix B

# INDEX OF AUTHORITIES

## Cases

*Alba v. State*, 905 S.W.2d 581 (Tex. Crim. App. 1995)(*overruled on other grounds*) ................................................................. 18, 19

*Brown v. State*, No. 07-99-2511-CR, 2000 Tex. App. LEXIS 7700 (Tex. App. — Amarillo 2000, no pet.)(*not designated for publication*) ................................................................. 29, 32

*Chambers v. State*, 866 S.W.2d 9 (Tex. Crim. App. 1993, cert. den'd) .............................................................................................. 9

*Colburn v. State*, 996 S.W.2d 511 (Tex. Crim. App. 1998) ............... 9

*Coleman v. State*, 881 S.W.2d 344 (Tex. Crim. App. 1994) ...... 10, 12

*De La Paz v. State*, 279 S.W.3d 336 (Tex. Crim. App. 2009) .......... 15

*Devoe v. State*, 354 S.W.3d 457 (Tex. Crim. App. 2014)... 14, 15, 16, 17, 18, 19

*Gamboa v. State*, 296 S.W.3d 574 (Tex. Crim. App. 2009) ............ 13

*Geesa v. State*, 820 S.W.2d 154 (Tex. Crim. App. 1991) ................ 10

*Jackson v. State*, 822 S.W.2d 18 (Tex. Crim. App. 1990) .............. 10

*Jacobs v. State*, 787 S.W.2d 397 (Tex. Crim. App. 1990) ................ 8

*Jessop v. State*, 368 S.W.3d 653 Tex. App. — Austin 2012, no pet.) .............................................................................................. 15

*Johnson v. State*, 263 S.W.3d 405 (Tex. App. — Waco 2008, pet. ref'd) ......................................................................................... 10

*Jones v. State*, 982 S.W.2d 386 (Tex. Crim. App. 1998) ................ 12

*King v. State*, 953 S.W.2d 266 (Tex. Crim. App. 1997) ...9, 26, 28, 30

*Kotteakos v. United States*, 328 U.S. 750 (1946) ........................... 26

*McCullen v. State*, 372 S.W.2d 693 (Tex. Crim. App. 1963) ........... 22

*Miller v. State*, 667 S.W2d 773 (Tex. Crim. App. 1984) .................. 22

*Moses v. State*, 105 S.W.3d 622 (Tex. Crim. App. 2003) ............... 18

*Murphy v. State*, 112 S.W.3d 592 (Tex. Crim. App. 2003) ............. 11

*Narvaiz v. State*, 840 S.W.2d 415 (Tex. Crim. App. 1992) ............... 8

*Paulson v. State*, 28 S.W.3d 570 (Tex. Crim. App. 2000) ............... 10

*Pondexter v. State*, 942 S.W.2d 577 (Tex. Crim. App. 1996) .......... 16

*Prible v. State*, 175 S.W.3d 724 (Tex. Crim. App. 2005) ................ 14

*Reese v. State*, 33 S.W.3d 238 (Tex. Crim. App. 2000) .................. 24

*Rogers v. State*, 853 S.W.2d 29 (Tex. Crim. App. 1993) ................ 15

*Wainwright v. Witt*, 469 U.S. 412 (1985) ........................................ 9

*Wyatt v. State*, 23 S.W.3d 18 (Tex. Crim. App. 2000) .................... 15

**Statutes**

Tex. Code Crim. Proc. Art. 35.16 ................................................. 8
Tex. Code Crim. Proc. Art. 37.07 ............................................... 32

**Rules**

Tex. R. App. P. 44.2 ....................................................... 12, 26
Tex. R. Evid. 403 ............................................................ 23
Tex. R. Evid. 404 ............................................................ 18

v

## STATEMENT REGARDING ORAL ARGUMENT

The State believes that oral argument is unnecessary because the facts and legal arguments are adequately presented in the briefs filed by the parties. Therefore, the State is not requesting oral argument.

## NOTE CONCERNING ABBREVIATIONS

In this brief, the State refers to the Clerk's Record as "CR" followed by the last three digits of the appellate cause number and the page number (e.g., CR(-123) 456). The State refers to the Reporter's Record as "RR" followed by the volume number and then the page number (e.g., RR v.4, 567). Exhibits are referred to by "St. Ex." or "Def. Ex." and the exhibit number (e.g., St. Ex. 123)

## STATEMENT OF THE CASE

Appellant was indicted in multiple counts and indictments for several felony offenses, as follows: [1]

D-1-DC-13-200256

Count 1        Aggravated Assault— Deadly Weapon        2nd degree

D-1-DC-13-200257

---

[1] Although the indictments in these cases list the counts using Roman numerals, for clarity the State will refer to the counts using Arabic numerals.

Count 1      Attempted Capital Murder                    1st degree

Count 2      Aggravated Assault— Public Servant          1st degree

D-1-DC-13-200259

Count 1      Aggravated Robbery                          1st degree

Appellant pleaded not guilty. A jury trial took place in all three Cause Numbers from October 13 to 17, 2014. CR(-722) 411; CR(-723) 415; CR(-724) 136. Appellant was convicted of Aggravated Assault— Deadly Weapon, Aggravated Assault— Public Servant, and Aggravated Robbery. *Id.* Appellant was acquitted of Attempted Capital Murder. CR(-723) 414. On October 20, 2014, the jury assessed Appellant's punishment at life imprisonment in each of the three Cause Numbers. CR(-722) 421; CR(-723) 424; CR(-724) 147. Appellant filed a timely notice of appeal in each cause on November 3, 2014. CR(-722) 433; CR(-723) 432; CR(-724) 159. The trial court certified Appellant's right to appeal on November 6, 2014. CR(-722) 435; CR(-723) 438; CR(-724) 161.

In the Court of Appeals for the Third District
Austin, Texas

---

**Mark Fruge,**
Appellant

v.

**The State of Texas,**
Appellee

---

Appeal from the 331st Judicial District Court
Travis County, Texas
Cause Numbers D-1-DC-13-200256; D-1-DC-13-200257;
D-1-DC-13-200259
Honorable Judge David Crain, Presiding

---

**STATE'S BRIEF**

---

To the Honorable Third Court of Appeals:

Now comes the State of Texas and files this brief in response to that of Appellant.

## STATEMENT OF FACTS

Abraham Martinez was an employee of the armored car company Guarda. RR v.6, 267. Martinez carried a firearm as part of his duties. *Id.* On January 14, 2013, he was working at an area

known as Capital Plaza.[2] RR v.6, 269. Capital Plaza is located at 5431 North I-35 Service Road. RR v.6, 248-9. One of the stores on Martinez's route was Fallas Discount. RR v.6, 270. Martinez entered the Fallas Discount store and picked up the deposits. RR v.6, 271. As he was leaving the store, he came around a pillar and there was a person pointing a gun at him who said, "Give me your bag." *Id.* Martinez complied. The person also told Martinez to place his weapon on the ground, which he did. *Id.* The man had on a dark hoodie, dark jeans, and sunglasses. RR v.6, 271-2. The man put Martinez's firearm in the money deposit bag and headed toward the exit of the Fallas Discount store. RR v.6, 272-3.

Working near the exit of the Fallas Discount store was a cashier named Ann Marie Lozano. RR v.7, 17. Lozano was checking out a customer when she suddenly saw a man in front of her pointing a gun in her face. *Id.* The man pulled the trigger and she ducked as the man fired two more times. *Id.* Lozano ducked under her counter until she heard everyone stop screaming. RR v.7, 17-8. This aggravated assault on Lozano was witnessed by Martinez. RR v.6, 273-4. It was also witnessed by Theresa Shanklin, another

---

[2] This location is misspelled in the record as "Capitol Plaza."

employee of Fallas Discount store. RR v.7, 43-4. The perpetrator then left the Fallas Discount store, and Shanklin witnessed him running toward the back of the Capital Plaza. RR v.7, 44. The police arrived within ten minutes. *Id.*

Austin Police Department (APD) Officer Roosevelt Granderson was on patrol that day near the Embassy Suites Hotel when he heard the call regarding a robbery in progress at Capital Plaza two blocks away from his location. RR v.7, 79. While heading toward Capital Plaza, Granderson was updated by radio that the perpetrator was in a vehicle at Cameron Road and Highway (Hwy.) 290. RR v.7, 83. The perpetrator was reported to be in a silver Mercury Grand Marquis. RR v.7, 84. APD Officer Aaron Pippin joined the pursuit behind Granderson. RR v.7, 85. Granderson observed the vehicle turning onto the Hwy. 183 service road from the Hwy. 290 service road and began to pursue. *Id.*

After some time, the perpetrator turned onto a little road that runs behind an H-E-B grocery store at the Springdale Shopping Center located off of the Hwy. 183 service road. RR v.7, 88. While driving on that road, all of a sudden the perpetrator stopped. RR v.7, 89. When the perpetrator stopped, Granderson tried to get out

of his patrol car and draw his weapon. *Id.* As Granderson was about to say, "Austin Police Department," the perpetrator was already getting out of his car. *Id.* The perpetrator had his gun, turned around, and started firing. *Id.*

Granderson ducked behind his car door as some of the rounds the perpetrator fired shot out his patrol car window. RR v.7, 89-90. Granderson drew his weapon and returned fire. RR v.7, 90. At the same time, Pippin was trying to get his car stopped and draw his weapon. RR v.7, 155. Pippin fired three rounds before holding his fire to make certain he did not hit Granderson. RR v.7, 156. The perpetrator ran in front of his vehicle into a wooded area and Granderson pursued while trying to give a description over the radio. *Id.* Pippin started to follow Granderson. *Id.* Granderson pursued until the perpetrator reached a tree line, at which point he shouted, "Austin Police, stop!" *Id.* At that moment, the perpetrator turned around and pointed his weapon at Granderson, who dove to the ground. *Id.* The perpetrator fired a couple more shots and then took off into the tree line. *Id.*

At that time Granderson began to feel a tingling in his knee. *Id.* Pippin assisted Granderson in returning to their patrol cars. *Id.*

4

Granderson's corporal called for EMS, who arrived at the scene and checked Granderson. *Id.* It was at that time Granderson learned that he had a gunshot wound. *Id.* Granderson had been shot in the right knee. RR v.9, 33. EMS transported Granderson to Brackenridge Hospital, where he underwent surgery for the gunshot wound. RR v.7, 90.

Richard Harris was an Assistant Manager at a Dollar General store located on Manor Road, just west of Hwy. 183. RR v.8, 145. On January 14, 2013 he was getting off of work at around 3:00 p.m. *Id.* When he was going to his car he noticed a man coming out from behind the Dollar General building. *Id.* The man came over to Harris's car as he was getting in. *Id.* The man produced a pistol and told Harris that they were going for a ride. RR v.8, 146. The man got into the backseat and Harris began driving according to the man's directions. *Id.* They made their way to Old Manor Road, where the man told Harris to pull over and the man left Harris's car. *Id.* During their time in the car, the man told Harris that his name was Mark, that "he had done something that he shouldn't have," and that he needed to get out of the area. RR v.8, 146-7. The entire incident in Harris's car took about fifteen minutes. RR v.8, 146.

APD Officer John Ridenour was one of the officers engaged in the hunt for the perpetrator following the Fallas Discount store robbery and the shootout with Granderson and Pippin. RR v.8, 163-4. Ridenour ran the license plate of the perpetrator's vehicle and it returned to an address of 9345 East Highway 290 Apt. 13104, also known as the Rosemont Apartments. RR v.8, 164-5.[3] Ridenour heard, over the radio, that the perpetrator had forced someone at gunpoint to drive him to Old Manor Road. RR v.8, 167. Ridenour knew this location to be right next to the Rosemont Apartments. *Id.* Upon learning this information, Ridenour headed to Old Manor Road and then the Rosemont Apartments. RR v.8, 169. Upon arriving at the Rosemont Apartments, Ridenour spotted someone matching the description of the perpetrator about one hundred yards away from him. RR v.8, 170. Ridenour yelled at the perpetrator to get his attention and the perpetrator ran back toward one of the buildings in the complex. RR v.8, 173. Ridenour got the attention of two nearby officers and then followed the perpetrator. RR v.8, 174. As Ridenour turned to face the building and readied

---

[3] Although Ridenour testified that he was "not sure if it was 9435 or 9345," State's Ex. 46 shows the address to be 9345 E. Hwy. 290.

his rifle, the perpetrator popped up in the breezeway of the building. *Id.* Ridenour gave the perpetrator instructions to put his hands up, which he did. *Id.* The perpetrator dropped a sweatshirt he had been holding. *Id.* The perpetrator complied with orders to get down on his hands and knees, and other officers were able to handcuff him. *Id.* Ridenour checked the sweatshirt and found a gun and U.S. currency wrapped in plastic inside. RR v.8, 175.

## SUMMARY OF THE STATE'S ARGUMENT

***Point One:*** Appellant argues that the trial court erred in granting a State's challenge for cause to a veniremember. Appellant argues that granting the State's challenge denied him a fair and impartial jury.

**Reply:** The trial court did not err in granting the State's challenge for cause because the veniremember said he would hold the State to a higher burden of proof than required by law. If this Court finds that the trial court did err, the error did not deprive Appellant of a lawfully constituted jury.

***Point Two:*** Appellant argues that the trial court erred in allowing the State to impeach a witness with Appellant's prior bad act.

**Reply:** The trial court did not err in admitting evidence of a bad act by Appellant because the bad act was same-transaction contextual evidence. If this Court finds the bad act was extraneous, it was properly admitted for purposes other than to show propensity or conformity. If this Court finds that the trial court did err, the error did not affect Appellant's substantial rights.

## STATE'S ARGUMENT

## REPLY TO POINT ONE

**The trial court did not err in granting the State's challenge for cause because the veniremember said he would hold the State to a higher burden of proof than required by law.**

The State may challenge a veniremember for cause who has a bias or prejudice against any phase of the law upon which the State is entitled to rely. Tex. Code Crim. Proc. Art. 35.16(b)(3). A veniremember who would hold the State to a burden of proof higher than beyond a reasonable doubt is challengeable for cause. *Narvaiz v. State,* 840 S.W.2d 415, 427 (Tex. Crim. App. 1992); *Jacobs v. State,* 787 S.W.2d 397, 404 (Tex. Crim. App. 1990). In reviewing the

trial court's decision to dismiss a veniremember upon a sustained challenge for cause, considerable deference is given to the trial court because it is in the best position to evaluate the veniremember's demeanor and responses. *Wainwright v. Witt*, 469 U.S. 412, 429 (1985); *Chambers v. State*, 866 S.W.2d 9, 22 (Tex. Crim. App. 1993, cert. den'd). When a veniremember's answers are vacillating, unclear, or contradictory, particular deference is accorded to the trial court's decision. *King v. State*, 29 S.W.3d 556, 568 (Tex. Crim. App. 2000); *Colburn v. State*, 996 S.W.2d 511, 517 (Tex. Crim. App. 1998).

In this case, the trial court excused Veniremember No. 12, Jason Samaniego–Krant, for cause on the grounds that he would hold the State to a burden of proof higher than beyond a reasonable doubt.[4]

**Beyond a Reasonable Doubt**

In *Paulson v. State*, the Court of Criminal Appeals dispensed with the requirement that a jury charge give a definition of

---

[4] Samaniego-Krant's complete responses in the record are appended as Appendix A.

9

reasonable doubt. 28 S.W.3d 570, 573 (Tex. Crim. App. 2000)(*overruling Geesa v. State*, 820 S.W.2d 154 (Tex. Crim. App. 1991)). However, it remains clear that reasonable doubt is not "beyond all doubt," "100 percent certain," nor "absolute certainty." *See Coleman v. State*, 881 S.W.2d 344, 359-60 (Tex. Crim. App. 1994); *Jackson v. State*, 822 S.W.2d 18, 28 (Tex. Crim. App. 1990); *Johnson v. State*, 263 S.W.3d 405, 417-8 (Tex. App. — Waco 2008, pet. ref'd).

Veniremember Samaniego–Krant stated, in his own words, that he "would have to be absolutely certain." RR v.6, 88-9. Further, when asked if he would require 100 percent certainty he responded, "Yeah." RR v.6, 192. The trial prosecutor then explained the law regarding the State's burden of proof to which Samaniego–Krant replied that he would need to be "pretty darn certain." *Id*. At this point, the trial court asked, "And when you say that, would you need to be 100 percent certain?" *Id*. Samaniego–Krant unequivocally answered, "Yes." *Id*. He also said that he would not hold the State to a higher burden of proof. RR v.6, 194. And, he also answered a question from trial counsel about the State's burden of proof by referring to the presumption of innocence. RR v.6, 193.

10

Samaniego-Krant repeatedly gave answers indicating he would hold the State to a burden of proof of 100 percent certainty. Although some of his answers were also vacillating and contradictory, the trial court was in the best position to evaluate his demeanor and responses. The trial court determined that he could not follow the law, and deference should be given to the trial court's determination.

**Appellant's Case Law Inapplicable**

Appellant argues that "prospective jurors may form their own definitions of proof beyond a reasonable doubt" and cites *Murphy v. State*, 112 S.W.3d 592 (Tex. Crim. App. 2003) and *Garrett v. State*, 851 S.W.2d 853 (Tex. Crim. App. 1993). However, both of those cases dealt with a jury's consideration of future dangerousness (special issue number two) in a death penalty case.

The Court of Criminal Appeals distinguished consideration of future dangerousness from the definition of beyond a reasonable doubt at guilt-innocence:

> "In *Garrett,* this Court held a veniremember is not subject to challenge for cause simply because the

11

veniremember would set his reasonable doubt threshold higher than the legal minimum in order to affirmatively answer special issue two. *Garrett* is clearly distinguishable because the trial court was entitled to find [the veniremember] would not find appellant guilty even if the State proved its case beyond a reasonable doubt."

*Coleman v. State*, 881 S.W.2d 344, 360 (Tex. Crim. App. 1994).

Therefore, this is not just a matter of "higher threshold", as Appellant claims. Rather, Appellant's position would allow any veniremember to hold the State to a higher burden by simply making his or her personal definition of "beyond a reasonable doubt" be "100 percent certainty" or "beyond all doubt."

**Any Error Was Harmless**

The issue in this case is an application of Article 35.16(b)(3), so it is not of constitutional dimension and any error must be disregarded unless it affected substantial rights. Tex. R. App. P. 44.2(b); *Jones v. State*, 982 S.W.2d 386, 391-92 (Tex. Crim. App. 1998). In the context of erroneous exclusions of veniremembers, this means that the record must show that "the error deprived the defendant of a lawfully constituted jury." *Jones*, 982 S.W.2d at 394.

Appellant asks this Court to find that any error in excluding Veniremember Samaniego–Krant is not subject to a harmless error review. However, Appellant relies upon authority that is specific to excluding veniremembers based upon their views on the death penalty in death penalty cases. Moreover, Appellant's claim has already been expressly rejected by the Court of Criminal Appeals:

> "Appellant relies on *Gray v. Mississippi* to support his position. But the Supreme Court has explained that the broad language in *Gray* was too sweeping to be applied literally and should not be extended beyond the context of the "'erroneous *Witherspoon* exclusion' of a qualified juror in a capital case." This Court has also held that, when *Witherspoon* error is not at issue, the erroneous excusal of a veniremember will call for reversal "only if the record shows that the error deprived the defendant of a lawfully constituted jury." Under *Jones*, the question is whether or not the jurors who actually sat were impartial."

*Gamboa v. State*, 296 S.W.3d 574, 590 (Tex. Crim. App. 2009) (internal footnotes omitted).

Appellant points to no evidence in the record, and has made no showing of any kind, that the exclusion of Samaniego–Krant deprived him of a lawfully constituted jury or that the jurors who actually sat were not impartial. Therefore, even if the trial court erred in granting the State's challenge for cause on Samaniego–

13

Krant, Appellant's substantial rights were not affected, and the judgment should be affirmed.

## REPLY TO POINT TWO

**The trial court did not err in admitting evidence of a bad act by Appellant because the bad act was same-transaction contextual evidence.**

Appellant argues that the trial court erred in admitting evidence of the aggravated kidnapping of Richard Harris.[5]

A trial court's ruling on the admissibility of evidence is reviewed under an abuse-of-discretion standard. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2014); *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the trial court's ruling will be upheld. *Devoe*, 354 S.W.3d at 469; *Prible*, 175 S.W.3d at 731. Moreover, if a trial court's evidentiary ruling is correct on any applicable theory of law, it will not be disturbed, even if the trial judge gave the wrong

---

[5] Discussed in detail in the Statement of Facts on page 5.

reason for his correct ruling. *Devoe,* 354 S.W.3d at 469; *Jessop v. State,* 368 S.W.3d 653, 686 (Tex. App. — Austin 2012, no pet.).

**Admissible as Same–Transaction Contextual Evidence[6]**

Evidence of another crime, wrong, or act is admissible as same–transaction contextual evidence where "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony… of any one of them cannot be given without showing the others." *Devoe,* 354 S.W.3d at 469; *Wyatt v. State,* 23 S.W.3d 18, 25 (Tex. Crim. App. 2000)(quoting *Rogers v. State,* 853 S.W.2d 29, 33 (Tex. Crim. App. 1993)). The jury is entitled to know all relevant surrounding facts and circumstances of the charged offense. *Devoe,* 354 S.W.3d at 469. Under Rule 404(b), same–transaction contextual evidence is admissible when the offense would make little or no sense without also bringing in that evidence. *Devoe,* 354 S.W.3d at 469; *Wyatt,* 23 S.W.3d at 25

---

[6] Appellant asserts that he was never charged with this crime. Appellant's Brief, 12. However, the record indicates that Appellant was in fact charged with this offense in Cause No. D-1-DC-15-200255. RR v.3, 4. For consistency, the State will refer to the incident involving Mr. Harris as "the aggravated kidnapping."

(quoting *Pondexter v. State*, 942 S.W.2d 577, 584 (Tex. Crim. App. 1996)).

The facts of this case are very similar to those in *Devoe*.[7] In *Devoe*, the Court of Criminal Appeals found that a theft of a gun, an aggravated assault, and a theft of a truck in Llano, Texas; a murder and attempted murder in a bar in Marble Falls, Texas; four murders in a residence in Jonestown, Texas; and a theft of a car at another residence in Greencastle, Pennsylvania, all constituted one extended criminal episode. *Devoe*, 354 S.W.3d at 462-65. These offenses covered a period of two days, from August 24th through August 26th. *Id.* Devoe was tried for two of the murders in Jonestown, but the Court of Criminal Appeals found that the entire chain of events was admissible same–transaction contextual evidence because the evidence was intermingled between all of the events and Devoe did not rest between incidents. *Id.* at 470.

That is the situation in the cases before this Court. Appellant committed one offense after another, in a continuous episode, and without rest in between incidents. The weapons and stolen property

---

[7] Given the lengthy exposition of facts in the *Devoe* opinion, it has been appended as Appendix B.

16

from each incident were used or linked with each subsequent incident. Evidence of the aggravated kidnapping of Harris was necessary for the jury to understand the prolonged criminal episode and to explain the timeline from the aggravated robbery at the Fallas Discount store to when Appellant fled back to the Rosemont Apartments where he was ultimately captured by police. The aggravated kidnapping explains how Appellant got to his apartment, and excluding it would have put a damaging hole in the State's case.

Appellant also contends that "evidence of the charged offense was presented in its entirety prior to the extraneous offense." Appellant's Brief, 15. However, this does not preclude the admissibility of same–transaction contextual evidence. In *Devoe*, the murders for which the defendant was tried occurred days before the other offenses were committed, but the Court of Criminal Appeals still found those subsequent offenses to be admissible as same–transaction contextual evidence. 354 S.W.3d at 462-5.

**Admissible as Evidence of Flight**

Evidence of extraneous offenses is not admissible at the guilt phase of a trial to prove that a defendant committed the charged offense in conformity with a bad character. Tex. R. Evid. 404(b); *Devoe*, 354 S.W.3d at 469. However, extraneous offense evidence may be admissible when it has relevance apart from character conformity. *Devoe*, 354 S.W.3d at 469; *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003). For example, it may be admissible to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Id.

Even if this Court finds that the aggravated kidnapping was not same–transaction contextual evidence, the aggravated kidnapping was admissible as evidence of Appellant's flight. It is axiomatic that flight is admissible as a circumstance from which an inference of guilt may be drawn. *Devoe*, 354 S.W.3d at 470; *Alba v. State*, 905 S.W.2d 581, 586 (Tex. Crim. App. 1995)(*overruled on other grounds*). If the extraneous offense is shown to be a necessarily related circumstance of the defendant's flight, it may be admitted to the jury. *Id.*

The cases before this Court again mirror the situation in *Devoe*. In *Devoe*, the theft of the vehicle from Betty DeHart in Greencastle, Pennsylvania was some two days after the murders for which Devoe was tried. *Devoe*, 354 S.W.3d at 463-5. Devoe was apprehended, after his flight with DeHart's vehicle, with evidence from his other crimes. *Id.* at 470. As in *Devoe*, Appellant was apprehended after the aggravated kidnapping with evidence from the other offenses he had committed that day.

In *Alba*, in which the court ruled that an extraneous offense was admissible as evidence of flight, the appellant forced two men to give him a ride in a car by showing a gun to one of them. *Alba*, 905 S.W.2d at 586. This incident occurred within an hour after Alba had committed murder, deceived a police officer when he left the crime scene, and abandoned his own car. *Id.*

The situation in the cases before this Court is even more tightly intertwined than the offenses in *Alba*. The aggravated kidnapping occurred immediately after Appellant abandoned his own car while engaging in a shootout with Officers Granderson and Pippin. The timeline in this case is even more compressed than those in *Devoe* and *Alba*, making the evidence of Appellant's flight

19

by the aggravated kidnapping of Mr. Harris even more relevant and probative.

**Admissible as Evidence of Intent**

The aggravated kidnapping was also admissible as evidence of Appellant's intent. The key issue at trial was whether or not Appellant had the specific intent to commit capital murder. Trial counsel laid the ground work for this strategy during jury selection. RR v.6, 145-150. Trial counsel specifically explored the situation of someone shooting towards others while running from them. *Id.* Trial counsel asked the venire panel, in that situation, "[i]s his intent to slow them down or to hit them?" RR v.6, 146. Later, trial counsel posed a rhetorical question to the venire panel, asking "Is his intent to get away or is his intent to shoot somebody?" RR v.6, 147. Trial counsel then asked "[i]f it's not his intent, is it knowingly when he's doing that?" RR v.6, 148.

Trial counsel raised this theory during the State's case-in-chief on cross-examination of the State's witnesses. Trial counsel asked Officer Granderson questions about whether firing a weapon while

moving decreases one's chances of hitting the target. RRv.7, 115, 117. Trial counsel asked similar question on cross-examination of APD Detective Carlos Vallejo. RR v.7, 135-36.

During his testimony, Appellant admitted committing all of the offenses for which he was on trial, except Attempted Capital Murder. RR v.9, 55-66. When asked if it was his intent to shoot the officers, he answered "[n]o, sir. I wasn't trying to hurt anyone." RR v.9, 65. Appellant claimed that he was not trying to shoot the officer, but that he "fired some shells over the car to get them to shoot at me." RR v.9, 59.

Furthermore, on cross-examination Appellant specifically admitted to committing the offenses of aggravated robbery, and aggravated assault with a deadly weapon. RR v.9, 73-4. Appellant then answered questions that confirmed each element of the offense of aggravated assault against a public servant. RR v.9, 77-82. However, he continued to maintain his innocence with regard to the Attempted Capital Murder Charge, stating, "[m]y intention was not to hurt anyone." RR v.9, 79.

Appellant claimed he only set out that day to get police officers to kill him. RR v. 9, 55. He claimed throughout his testimony that

21

his conduct that day was intended not to hurt anyone, but to bring the police to his location. RR v. 9, 55, 57-59. However, when the aggravated kidnapping occurred, Appellant had already encountered and eluded the police. RR v.9, 60. Therefore, the aggravated kidnapping evidence was highly probative to prove that Appellant's intent was not to draw the police to him, since he had already done so, but rather to get away from the police.

Given that Appellant's strategy put his lack of intent to commit capital murder at the center of the trial, evidence of the aggravated kidnapping was admissible to prove his intent.

**Admissible as Evidence of Identity**

The aggravated kidnapping was also admissible as evidence of Appellant's identity. Identity is an element of an offense that the State must prove beyond a reasonable doubt. *See Miller v. State*, 667 S.W2d 773, 775 (Tex. Crim. App. 1984); *McCullen v. State*, 372 S.W.2d 693, 695 (Tex. Crim. App. 1963).

There was specific evidence related to proving the element of identity that occurred during the aggravated kidnapping offense.

22

While in the car and forcing Harris to drive at Appellant's direction, Appellant told Harris that "his name was Mark and he had done something that he shouldn't have, but he needed to get out of the area." RR v.8, 147. This admission was highly probative evidence that Appellant, who was not apprehended until the Rosemont Apartments, was the person who had committed the initial aggravated robbery at the Fallas Discount Store. As Appellant successfully escaped from the scene of every offense he committed until he was apprehended at the Rosemont Apartments, it was important for the State to account for every possible moment between Appellant's arrival at the Fallas Discount store and his apprehension.

**Admissible Under Tex. R. Evid. 403 Balancing Test**

The probative value of the aggravated kidnapping evidence was not substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. In conducting a Rule 403 analysis, courts should consider: (1) how probative is the evidence; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless

23

indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence. *Reese v. State*, 33 S.W.3d 238, 240-41 (Tex. Crim. App. 2000).

In the case before the Court, the aggravated kidnapping evidence was highly probative of Appellant's identity and intent. The aggravated kidnapping evidence's probative nature as to identity and intent are discussed in the immediately preceding sections.[8]

The potential for the aggravated kidnapping evidence to impress the jury in an irrational but indelible manner is very low. The aggravated kidnapping evidence was a small part of Appellant's conduct that day. Further, it was far less egregious than the other evidence the jury had already heard concerning the events in the Fallas Discount store and at the H-E-B. In both of those instances, Appellant actually discharged his firearm and even shot one victim, Granderson. By contrast, Harris was unharmed and Appellant did not fire his weapon during the aggravated kidnapping.

Very little time was devoted to introducing the evidence of the aggravated kidnapping. The aggravated kidnapping evidence was introduced through a single witness, Harris, while there were

---

[8] Discussed on page 20-23.

seventeen total witnesses in the State's case–in–chief.[9] It also involved the use of four exhibits out of some three hundred twenty-six exhibits introduced by the State in the guilt-innocence phase.[10]

The State had great need for the evidence. It was the only evidence that permitted the State to account for the time gap between the end of the shootout with Granderson and Pippin at the H-E-B and Appellant's capture at the Rosemont Apartments. It was also the only evidence of continued violent conduct after escaping the police, which made it unique in proving Appellant's intent.

Upon consideration of the Rule 403 balancing test factors, the probative value of the aggravated kidnapping evidence was not substantially outweighed by the danger of unfair prejudice.

**Any Error Was Harmless**

If this Court finds that the trial court did abuse its discretion and that admission of the aggravated kidnapping evidence was error, this Court should not reverse unless it finds that the error

---

[9] One other witness, Susan O'Dell Gibson, testified to processing Harris's car for evidence but gave no testimony as to the facts of the aggravated kidnapping. RR v.7, 69-70.

[10] Three exhibits, State's Ex. 218-220, were introduced through Harris. One exhibit, State's Ex. 132, was shown to Harris but had already been introduced.

25

affected Appellant's substantial rights. Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)(citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In these cases, the Court should find that Appellant's substantial rights were not affected.[11]

### *Appellant's Trial Strategy Was Successful*

Appellant's trial strategy was to admit that he was guilty of Aggravated Robbery, Aggravated Assault, and Aggravated Assault Against a Public Servant, but deny that he had the requisite specific intent to commit the offense of Attempted Capital Murder.[12] RR v.9, 55-66, 74-75, 79. Appellant was acquitted by the jury of the

---

[11] Appellant asserts that the State "introduced photos early in the guilt innocence phase of trial labeled 'car jacking.'" Appellant's Brief, 12. This is an erroneous assertion. After searching the record, the State found no exhibits labeled "car-jacking." Nor were there any exhibits marked with "aggravated kidnapping."

[12] Appellant makes no claim that the admission of the aggravated kidnapping evidence in any way influenced his decision to testify. Indeed, Appellant's direct testimony covers some fourteen pages of the record, of which only three and one-fifth pages relate to the aggravated kidnapping. Appellant's cross-examination testimony covers nine and two-fifths pages of the record, of which one question mentions the aggravated kidnapping.

Attempted Capital Murder count. CR(-257) 413-14. Therefore, if it was error to admit the aggravated robbery evidence, there was no harm to Appellant because his trial strategy still succeeded.

In fact, his testimony about the aggravated kidnapping helped his trial strategy. In an effort to support his strategy, he testified numerous times about how he did not harm, or intend to harm, other victims and witnesses that day. RR v.9, 57, 62-64.

Appellant also specifically testified that he "didn't threaten" Harris. RR v.9, 60. He added that he told Harris his first name because he "was trying to make him feel at ease" and "just trying to make him feel" that Appellant "wasn't going to hurt him..." RR v.9, 61. Appellant also testified that he did not point his gun at Harris, but just showed it to him and then put it in his pocket. RR v.9, 66.

Additionally, trial counsel advanced this strategy during closing argument. Trial counsel devoted some five pages, out of twelve in the record, to arguing that the State had failed to prove the element of specific intent on the Attempted Capital Murder charge. RR v.9, 115-120. Trial counsel later returned to that issue once more. RR v.9, 124. Finally, trial counsel told the jury that, unlike Attempted Capital Murder, Appellant was guilty of the

Aggravated Assault of a Public Servant count because "that's the proper charge." RR v.9, 120.

Therefore, if it was error to admit the aggravated kidnapping evidence, there was no harm to Appellant because he was acquitted of the one count on which he maintained his innocence throughout the trial.


### *Little Time Spent Developing Evidence*

It took very little time to introduce evidence of the aggravated kidnapping. Harris's testimony and the exhibits are previously mentioned.[13] The State mentioned the aggravated kidnapping evidence once during cross-examination of the Appellant. RR v.9, 75. The evidence of the aggravated kidnapping was mentioned only once by the State in closing argument. RR v.9, 128. The aggravated kidnapping evidence was never mentioned as character or propensity evidence. *See King*, 953 S.W.3d at 273 ("that the State did not emphasize the reports minimizes the deleterious effect, if any, the documents had on the jury's decision."); *Rodriguez*, 974

---

[13] Discussed on page 24-25.

S.W.2d at 370 ("Furthermore, no one mentioned the inadmissible evidence again during the guilt/innocence phase of the trial. So, the extent to which the jury may have recalled and assigned it weight is questionable.").

### *No Unfair Surprise or Lack of Notice*

Nor was Appellant unfairly surprised by the State's offering of the aggravated kidnapping evidence at trial. *See Brown v. State*, No. 07-99-2511-CR, 2000 Tex. App. LEXIS 7700, at *12 (Tex. App. — Amarillo 2000, no pet.)(not designated for publication)("Moreover, the admission of the extraneous evidence was not unannounced or surprising. Quite the contrary, the State received permission from the court to present it before doing so. Thus, reversal is not needed as punishment to assure the State's compliance with the rules of evidence.") Appellant makes no claim of being surprised by the evidence of the aggravated kidnapping. Rather, the record reflects that Appellant was specifically advised of the State's intent to try to introduce the aggravated kidnapping evidence at trial. RR v.8, 141.

Appellant had more than five months' advance notice that this evidence might be introduced at trial. CR(–256) 144-46.

*Overwhelming Evidence of Guilt*

Further, there was overwhelming evidence of Appellant's guilt. *See King*, 953 S.W.2d at 273 ("While the case summaries and disciplinary reports did contain some potentially harmful evidence, that evidence was rendered insignificant by properly admitted evidence of future dangerousness."); *Rodriguez*, 974 S.W.2d at 370 ("Finally, though it was not free of conflict, ample evidence was properly admitted which depicted appellant's guilt.") As mentioned above, sixteen witnesses and some three hundred twenty-two exhibits were introduced in the State's case-in-chief, separate from any aggravated kidnapping evidence. Additionally, Appellant took the stand and admitted committing the Aggravated Robbery, the Aggravated Assault with Deadly Weapon, and the Aggravated Assault Against a Public Servant. RR v.8, 56-59, 63-65, 73, 78-81.

Numerous witnesses identified Appellant as the perpetrator of each offense. From the Fallas Discount store scene, Lozano and

Shanklin identified Appellant as the person who robbed Martinez and shot at Lozano and her register. RR v.7, 21, 45. From the crime scene at the H-E-B, Pippin identified Appellant as the person who engaged in a shootout with himself and Granderson. RR v.7, 158-59. From the Rosemont Apartments scene, Ridenour identified Appellant as the person he chased and took into custody. RR v.8, 175-76. The stolen bag holding the money and Martinez's gun were found in Appellant's vehicle. RR v.7, 123-24. There was also an item found in Appellant's vehicle that had his name and the Rosemont Apartment address on it. RR v.7, 124. Appellant's vehicle was linked to him through testimony and registration records. RR v.8, 108-110, 165, 186-88; St. Ex. 46. The money stolen from Martinez and Appellant's own gun, which matched the type of magazine found in his vehicle, were found on Appellant. RR v.8, 181-85. Therefore, the evidence of Appellant's guilt was overwhelming.

### No Risk of Undue Punishment

Evidence of the aggravated kidnapping was admissible during the punishment phase of trial, and was so in the form that it came

into evidence during guilt-innocence (i.e., the testimony of Harris and exhibits). Tex. Code Crim. Proc. Art. 37.07; *Brown*, 2000 Tex. App. LEXIS 7700 at 12. Therefore, it cannot be said that the aggravated kidnapping evidence somehow induced the jury to assess undue punishment. *Brown*, 2000 Tex. App. LEXIS 7700 at 12.

### *Conclusion*

These combined factors show that, even if admission of the aggravated kidnapping evidence was error, Appellant's substantial rights were not affected and the judgment should be affirmed.

**PRAYER**

The State requests that this Court overrule Appellant's points of error and affirm the trial court's judgment.

Respectfully submitted,

**Rosemary Lehmberg**
District Attorney
Travis County


*/s/ Matthew Foye*
**Matthew Foye**
Assistant District Attorney
State Bar No. 24043661
P.O. Box 1748
Austin, Texas 78767
512-854-9400 (phone)
512-854-4810 (fax)
*Matthew.Foye@traviscountytx.gov*
*AppellateTCDA@traviscountytx.gov*

## CERTIFICATE OF COMPLIANCE AND SERVICE

I certify that this brief contains 5,957 words, based upon the computer program used to generate this brief and excluding words contained in those parts of the brief that Texas Rule of Appellate Procedure 9.4(i) exempts from inclusion in the word count, and that this brief is printed in a conventional, 14-point typeface.

I further certify that, on the 28th day of October, 2015, a true and correct copy of this brief was served, by U.S. mail, electronic mail, telephonic document transmission, or electronically through the electronic filing manager, to Appellant's attorney, Ariel Payan, 1012 Rio Grande Street, Austin, Texas 78701.

*/s/ Matthew Foye*
**Matthew Foye**
Assistant District Attorney

# Appendix A

# Veniremember 12's Responses

kind of tricky where people kind of may feel like -- for me it feels like beyond a reasonable doubt is to be like certain -- to me. And so that kind of thing is okay.

I'm just saying that if you were sitting at the end of the day after hearing all the evidence and you said, Well, there's this one little doubt over here and it's not even reasonable, because it would involve martians coming in a spaceship; but it's a doubt so you have to find him not guilty. That's the kind of thing -- that's an extreme example, but that's the sort of thing that we're talking about. You-all feel, like, you could hear all the evidence and if you are convinced beyond a reasonable doubt that you would be able to return a verdict of guilty?

MS. CHRISTIANSEN: That, yes.

MR. MORRIS: Yeah, I can find a reason.

MR. FOYE: What's that?

MR. MORRIS: Yeah, I could.

MR. FOYE: Good. Excellent. Okay.

So based on that kind of clarification, Row 2, anyone who would still want me to prove it beyond all possible doubt?

No. 12?

MR. SAMANIEGO-KRANT: I believe that we've been talking about incarceration, taking years of

someone's life that I would have to be absolutely certain. The level of false convictions are incorrect, and with convictions these days I would feel horrible about sending someone to prison for something that was doubtful.

MR. FOYE: Okay. Thank you. Anyone else? Row 2?

VENIRE PANEL: (No response)

MR. FOYE: Row 3, anyone?

VENIRE PANEL: (No response)

MR. FOYE: Okay. Row 4 is Mr. Bidwell. You feel you would want to know all about it?

MR. BIDWELL: (Nods head)

MR. FOYE: Okay. Thank you.

Now, Row 5, anyone? Ms. Janssen?

MS. JANSSEN: Same thing.

MR. FOYE: Same thing as 12?

MS. JANSSEN: Yes.

MR. FOYE: Okay. And Row 6, anyone back there?

VENIRE PANEL: (No response)

MR. FOYE: And Row 7?

VENIRE PANEL: (No response)

MR. FOYE: Anyone on this side of the room?

officer comes in and says, no, this is what happened. And you just go with the officer because they're on the side of truth and the other person has to be lying, it's just not always like that. It's not black and white like that, but I think that's what we expect things to be.

Yes, sir, Mr. -- 27?

MR. COLE: 27, Cole. You know, since we're talking about that case right there, I feel like the prosecutor did provide the evidence because of a sworn police officer who is also sworn in court and he had the instrument to speak of.

Also, to me, reasonable doubt, nobody is just -- I feel I've had those kind of tickets, too, but it's very easy to accidentally rest your foot on the accelerator and perhaps increase the speed of your car that is under cruise control. So there's reasonable doubt right there that they may have been going 93 and just didn't realize it.

MR. HILDRETH: Okay. Well, see, here's -- you're going the opposite way. The Defense doesn't have to establish reasonable doubt about the State's case. We just have to attack it.

What the law requires is the State prove their burden beyond a reasonable doubt. And what I mean

is there can be no other reasonable explanation. So now the definition of what is reasonable? I mean -- yes, sir, No. 12?

MR. SAMANIEGO-KRANT: It just kind of sounds to me like in talking about reasonable doubt, it almost sounds to me like you're trying to prove innocence instead of proving guilty. It just sounds backwards to me like you're trying to prove innocence -- you're guilty until proven innocent. It just sounds like that to me.

MR. HILDRETH: Okay. Let me ask you this. When you all walked in, who looked at the tables and tried to figure out who the defendant was?

VENIRE PANEL: (Indicating)

MR. HILDRETH: I know that's normal human behavior, sure.

Okay, Mr. Custer, did you determine who the defendant was?

MR. CUSTER: Yes, sir.

MR. HILDRETH: Okay. And did you wonder what he did?

MR. CUSTER: Yes, sir.

MR. HILDRETH: Who else wondered what he did? Raise your hands high.

VENIRE PANEL: (Indicating)

not --

THE COURT:  Did he come up here to talk to about something?

MR. LEVINGSTON:  He was in hospice care for his dog.

THE COURT:  The first time he said it, I thought it was his --

MS. CHEN-KERCHER:  A person.

THE COURT:  -- 16-year-old, I figured must have been a brother or sister.

MR. HILDRETH:  Yeah.  I think that's what he wanted when he --

MR. FOYE:  He did.  He said a close family member.  A 16-year-old --

THE COURT:  It's his dog.

MR. FOYE:  I mean, it's impressive the dog is 16 years old, but I didn't --

(Discussion off record)

THE COURT:  Okay.  Mr. Samaniego-Krant, can you come up to the bench close enough for us to talk to you?  Can you -- can one of you-all illuminate the area you want to talk about?

(Venire Member No. 12, Mr. Samaniego-Krant, approached bench)

MR. LEVINGSTON:  Yeah, Judge, if I may?

Mr. Samaniego, I know when Mr. Foye was questioning you about the burden of proof and reasonable doubt and beyond a reasonable doubt, you had made the comment that you would need to be 100 percent certain.

MR. SAMANIEGO-KRANT: Yeah.

MR. LEVINGSTON: And you understand that the law is beyond a reasonable doubt. There is actually -- while there is no definition for beyond a reasonable doubt, there is case law that says it's not 100 percent certainty. Would you be able to follow the law and listen to a case and determine guilt or innocence based on beyond a reasonable doubt, or would you need 100 percent certainty?

MR. SAMANIEGO-KRANT: In my personal beliefs, spirituality and opinion I just feel that I'm taking into consideration someone else's livelihood, I would need to be pretty darn certain.

THE COURT: Okay. And when you say that, would you need to be 100 percent certain?

MR. SAMANIEGO-KRANT: Yes.

MR. LEVINGSTON: Okay. No questions, Judge.

THE COURT: Did you have any backup questions?

MR. HILDRETH: When you say "100 percent

certain," are you attributing that to beyond a reasonable doubt level or -- I'm not sure what -- because you say you have to be pretty confident.

MR. SAMANIEGO-KRANT: If I'm going to commit (sic) somebody to a crime, then I would want to be 100 percent certain that that crime was committed beyond a reasonable doubt.

MR. HILDRETH: Okay. And is that what you require -- are you -- there is not percentage to beyond a reasonable doubt. Now, for some people it might be 100 percent.

MR. SAMANIEGO-KRANT: Right.

MR. HILDRETH: The point is, are you going to hold the State to its burden, or are you going to require the State to a higher burden than what they're required?

MR. SAMANIEGO-KRANT: I would hold someone innocent until proven guilty, not the other way around, which to me is how it sounds with our discussion. It sounds like people are trying to prove innocence instead of guilt.

MR. HILDRETH: Okay.

MR. SAMANIEGO-KRANT: So I'm -- yes. I mean --

MR. HILDRETH: Are you going to require

the State -- to hold the State to a higher burden of proof than beyond a reasonable doubt?

MR. SAMANIEGO-KRANT:  No.

MR. HILDRETH:  Okay.  I have no further questions.

THE COURT:  All right.  You can step back outside.  Thanks.

(Venire Member No. 12, Mr. Samaniego-Krant, approached bench) exited courtroom)

THE COURT:  Okay.  Now, what about Custer, No. 13?  We're going to get back to him.  No motions on Custer?

MR. HILDRETH:   Nothing on 13.

THE COURT:  Edwards?

MR. HILDRETH:  No, sir.

THE COURT:  Okay.  Did you-all want to talk -- does the State still have a motion to strike?

MR. LEVINGSTON:  I do, Judge.

THE COURT:  What does was the Defense say on Samaniego?

MR. HILDRETH:  We're going to object to that.  He said he would would hold the State to its burden and not more.

THE COURT:  Okay.  But he said 100 percent three times, so I'll grant the State's motion to

strike for cause. I think he won't follow the law that they're entitled to follow.

(Venire Member No. 12, Mr. Samaniego-Krant, struck for cause)

THE COURT: So 13 and 14 are good. Kelly Hayden, any motions?

(No response)

THE COURT: Scott Broaddus, any motions?

MR. HILDRETH: Yes, Your Honor. He said he would have a bias against the State -- I mean, excuse me against the defendant and has a bias for law enforcement.

MR. LEVINGSTON: I agree, Judge.

THE COURT: You agree to strike him for cause?

MR. LEVINGSTON: I do.

THE COURT: Swan, No. 17? 18, Flores? 19, Buckner? 20 is excused. JoAnn Parks, 21? Darin Upchurch, 22? Patricia Rowell, 23? Betty Dickson, 24 (sic)?

MR. FOYE: We had talked to 24. She was excused. I believe Betty Dickson --

THE COURT: Yeah. I meant 25, Betty Dickson.

MR. HILDRETH: No, sir. Nothing from the

# Appendix B

## Opinion: *Devoe v. State*, 354 S.W.3d 457

 **Positive** Last updated October 01, 2015 04:42:24 pm GMT

 **Positive** When saved to folder October 01, 2015 04:42:24 pm GMT

# *Devoe v. State*

Court of Criminal Appeals of Texas

December 14, 2011, Delivered

NO. AP-76,289

**Reporter**

354 S.W.3d 457; 2011 Tex. Crim. App. LEXIS 1669

PAUL DEVOE, Appellant v. THE STATE OF TEXAS

**Notice:** PUBLISH

**Subsequent History:** Writ of habeas corpus denied *Ex parte Devoe, 2014 Tex. Crim. App. Unpub. LEXIS 38 (Tex. Crim. App., Jan. 15, 2014)*

**Prior History:** **[**1]** ON DIRECT APPEAL FROM CAUSE NO. 07-302093 IN THE 403RD DISTRICT COURT, TRAVIS COUNTY. TRIAL COURT JUDGE: BRENDA P. KENNEDY.

## Case Summary

**Procedural Posture**

Defendant appealed a judgment of the 403rd District Court, Travis County (Texas), convicting him of capital murder, specifically the intentional murder of two individuals during the same criminal transaction under *Tex. Penal Code § 19.03(a)(7)(A)*, and sentencing him to death under *Tex. Code Crim. Proc. Ann. art. 37.071, § 2(g)*.

**Overview**

On appeal, the court held that the evidence was sufficient to show that there was a probability that defendant would criminal acts of violence that would constitute a continuing threat to society under *Tex. Code Crim. Proc. Ann. art. 37.071, § 2(b)(1)* because it showed that: (1) during his crime spree, defendant attempted to kill one victim, and did kill three others; (2) he had a lengthy criminal history; (3) he had a lengthy history of abusing women; (4) he once attempted to strangle his mother; (5) he abused alcohol and drugs and tended to become more violent when he did so; and (6) inmates in Texas had access to drugs, alcohol, and weapons, and many violent crimes occurred inside Texas prisons. The trial court did not abuse its discretion by admitting extraneous evidence under *Tex. R. Evid. 404(b)* of

defendant's theft of his friend's gun, the aggravated assault of one victim, the killing of the victim from whom he stole the vehicle, and the robbery of yet another victim, because the State needed the evidence to give context to defendant's crime spree. Defendant did not rest between incidents and he stole the gun to go after women and to then effectuate his flight.

**Outcome**

Defendant's conviction and sentence were affirmed.

## LexisNexis® Headnotes

Criminal Law & Procedure > ... > Appeals > Standards of Review > General Overview

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

*HN1* In reviewing the sufficiency of the evidence at the punishment phase, an appellate court views the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could make the finding beyond a reasonable doubt.

Criminal Law & Procedure > Sentencing > Capital Punishment > Aggravating Circumstances

*HN2* Some factors a jury may consider when determining whether a defendant will pose a continuing threat to society include the following: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the commission of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the commission of the offense; (7) psychiatric evidence; and (8) character evidence. This list is not exclusive.

Page 2 of 14

354 S.W.3d 457, *457; 2011 Tex. Crim. App. LEXIS 1669, **1

Criminal Law & Procedure > Sentencing > Capital Punishment > Aggravating Circumstances

***HN3*** In determining the special issues, the jury is entitled to consider all of the evidence at both the guilt and punishment stages of trial. *Tex. Code Crim. Proc. art. 37.071, § 2(d)(1)*. The circumstances of the offense and the events surrounding it may be sufficient in some instances to sustain a "yes" answer to the future dangerousness special issue.

Criminal Law & Procedure > ... > Appeals > Standards of Review > General Overview

Criminal Law & Procedure > Sentencing > Capital Punishment > Aggravating Circumstances

Criminal Law & Procedure > Sentencing > Capital Punishment > Mitigating Circumstances

***HN4*** While good behavior in prison is a factor to consider, it does not preclude a finding of future dangerousness. The Court of Criminal Appeals of Texas can review the objective evidence of future dangerousness, but it does not engage in reviewing the jury's normative decision on mitigation.

Evidence > Admissibility > Conduct Evidence > Prior Acts, Crimes & Wrongs

***HN5*** Evidence of extraneous offenses is not admissible at the guilt phase of a trial to prove that a defendant committed the charged offense in conformity with a bad character. *Tex. R. Evid. 404(b)*. However, extraneous offense evidence may be admissible when it has relevance apart from character conformity. For example, it may be admissible to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Evidence of another crime, wrong, or act also may be admissible as same-transaction contextual evidence where "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, of any one of them cannot be given without showing the others. The jury is entitled to know all relevant surrounding facts and circumstances of the charged offense. But, under *Rule 404(b)*, same-transaction contextual evidence is admissible only when the offense would make little or no sense without also bringing in that evidence, and it is admissible only to the extent that it is necessary to the jury's understanding of the offense.

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > Evidence

Evidence > Admissibility > Conduct Evidence > Prior Acts, Crimes & Wrongs

***HN6*** Whether extraneous offense evidence has relevance apart from character conformity, as required by *Tex. R. Evid. 404(b)*, is a question for the trial court. Thus, a trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse-of-discretion standard. As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the trial court's ruling will be upheld. A trial court's *Rule 404(b)* ruling admitting evidence is generally within this zone if there is evidence supporting that an extraneous transaction is relevant to a material, non-propensity issue. If the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed, even if the trial judge gave the wrong reason for his correct ruling.

Criminal Law & Procedure > ... > Resisting Arrest > Fleeing & Eluding > Consciousness of Guilt

Evidence > Admissibility > Conduct Evidence > Prior Acts, Crimes & Wrongs

***HN7*** Flight is admissible as a circumstance from which an inference of guilt may be drawn. And if the extraneous offense is shown to be a necessarily related circumstance of the defendant's flight, it may be admitted to the jury.

Criminal Law & Procedure > Trials > General Overview

Evidence > Types of Evidence > Circumstantial Evidence

***HN8*** When the identity of the perpetrator can be established by circumstantial evidence only, identity is a contested issue even if the defense rests with the State, puts on no evidence, and raises no defensive theories.

Criminal Law & Procedure > Trials > Jury Instructions > Limiting Instructions

Evidence > Admissibility > Conduct Evidence > Prior Acts, Crimes & Wrongs

***HN9*** A limiting instruction is not required when evidence is admitted as same-transaction contextual evidence.

Criminal Law & Procedure > ... > Challenges for Cause > Bias & Impartiality > General Overview

Criminal Law & Procedure > Juries & Jurors > Peremptory Challenges > Proving Discriminatory Use

***HN10*** In holding that Batson challenges do not apply to peremptory strikes based upon religion, the Court of Criminal Appeals of Texas stated that, by definition, a religious belief (unlike race or gender) is a subscription to a set of beliefs and convictions. Strikes based on personal belief have long been recognized as appropriate and are, in fact, the

Page 3 of 14

354 S.W.3d 457, *457; 2011 Tex. Crim. App. LEXIS 1669, **1

foundation of the entire voir dire process. In discussing the difference between striking jurors on the basis of race or gender versus religion, the court stated that attributing to women or African Americans as a group any specific moral, political, or social belief is overly broad because membership in the group does not depend upon subscription to the belief. It is invidious because individual members who do not share the belief are made to suffer the attribution anyway. But in the case of religion, the attribution is not overly broad, and therefore not invidious, when the belief is an article of faith. Because all members of the group share the same faith by definition, it is not unjust to attribute beliefs characteristic of the faith to all of them.

> Criminal Law & Procedure > Sentencing > Capital Punishment > Mental Retardation

> Criminal Law & Procedure > Sentencing > Cruel & Unusual Punishment

**HN11** There is no authority from the United States Supreme Court or the Court of Criminal Appeals of Texas suggesting that mental illness that is a "contributing factor" in the defendant's actions or that caused some impairment or some diminished capacity, is enough to render one exempt from execution under the Eighth Amendment.

> Criminal Law & Procedure > ... > Challenges for Cause > Bias & Impartiality > Actual & Implied Bias

**HN12** See *Tex. Code Crim. Proc. Ann. art. 35.16(a)(10)*.

**Counsel:** For APPELLANT: KARYL ANDERSON KRUG, AUSTIN.

For STATE: MICHAEL SCOTT TALIAFERRO, ASST. D.A., AUSTIN; LISA C. MCMINN, STATE'S ATTORNEY, AUSTIN.

**Judges:** HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., and MEYERS, JOHNSON, KEASLER, COCHRAN and ALCALA, JJ., joined. PRICE and WOMACK, JJ., concurred.

**Opinion by:** HERVEY

# Opinion

 [*461] Appellant, Paul Devoe, was convicted in October 2009 of capital murder, specifically the intentional murder of two individuals (Haylie Faulkner and Danielle Hensley)

during the same criminal transaction. *See TEX. PENAL CODE § 19.03(a)(7)(A)*. Based upon the jury's answers to the special issues set forth in *Texas Code of Criminal Procedure Article 37.071, Sections 2(b)* and *2(e)*, the trial judge sentenced Appellant to death. *TEX. CODE CRIM. PROC. art. 37.071, § 2(g)*.[1] Direct appeal to this Court is automatic. *Art. 37.071, § 2(h)*. Appellant raises nine points of error. After reviewing Appellant's points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

Appellant challenges the sufficiency of the evidence at the punishment phase of trial. We shall address this issue first. The remaining points of error will be addressed in the order presented in the briefs.

In point of error eight, Appellant contends that the evidence is insufficient to prove beyond a reasonable doubt that there is a probability that he will commit criminal acts of violence that would constitute a continuing threat to society. *See art. 37.071, § 2(b)(1)*. Specifically, he argues that his behavioral record in prison is "almost pristine," and therefore, the State's evidence of problems within the Texas Department of Criminal Justice (TDCJ) should not be weighed against him.

**HN1** In reviewing the sufficiency of the evidence at the punishment phase, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could make the finding beyond a reasonable doubt. *Banda v. State, 890 S.W.2d 42, 50 (Tex. Crim. App. 1994)*; *see also Young v. State, 283 S.W.3d 854, 863 (Tex. Crim. App. 2009)*. **HN2** Some factors a jury may consider when determining whether a defendant will [**3] pose a continuing threat to society include the following:

> 1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;

> 2. the calculated nature of the defendant's acts;

> 3. the forethought and deliberateness exhibited by the crime's execution;

>  [*462] 4. the existence of a prior criminal record, and the severity of the prior crimes;

> 5. the defendant's age and personal circumstances at the time of the commission of the offense;

> 6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;

---

[1] Unless otherwise indicated, all future [**2] references to Articles refer to the Texas Code of Criminal Procedure.

Page 4 of 14

354 S.W.3d 457, *462; 2011 Tex. Crim. App. LEXIS 1669, **3

7. psychiatric evidence; and

8. character evidence.

*Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987); *see also Coble v. State, 330 S.W.3d 253, 287-89 (Tex. Crim. App. 2010)*. This list is not exclusive.

*HN3* In determining the special issues, the jury is entitled to consider all of the evidence at both the guilt and punishment stages of trial. *Art. 37.071, § 2(d)(1)*; *see also Young, 283 S.W.3d at 863*. The circumstances of the offense and the events surrounding it may be sufficient in some instances to sustain a "yes" answer to the future dangerousness special issue. *Banda, 890 S.W.2d at 51*; **[**4]** *see also Hayes v. State, 85 S.W.3d 809, 814 (Tex. Crim. App. 2002)*.

The evidence presented at guilt revealed that, in late August 2007, Appellant stole a silver Jennings .380-caliber handgun ("the gun"), two ammunition magazines, and fifteen Winchester bullets from his friend, Bill Brinlee. Brinlee considered Appellant to be "family," as Appellant had previously lived with the Brinlees. Appellant had access to the house, knew that the Brinlees would be out of town for a wedding during the weekend of August 24, and was aware that the gun was kept in the master bedroom.

On August 24, 2007, Appellant was residing at the Llano home of Sharon Wilson in exchange for work he had agreed to do around her home. At about 3:00 p.m., Wilson came home to find Appellant outside with the gun. Wilson had previously informed Appellant that she did not allow firearms in her home, and she asked that he not bring it in the house. She assumed that Appellant complied with her request.

A short while later, Wilson found Appellant looking in her purse. He claimed to be looking for a cigarette. Appellant then went to take a nap. At this point, Wilson decided that it was time to ask Appellant to vacate her home. **[**5]** She called some friends to be with her when she told him because she was afraid of how Appellant might react to the request. While waiting for her friends, she discovered that Appellant had emptied the gas can that she had filled for her lawn mower. Angered, Wilson felt she could wait no longer, so she went to confront Appellant.

Upon finding Appellant asleep in her bedroom, Wilson woke him and told him that he needed to leave. Appellant got up and went directly to the living room couch where he retrieved the gun from a hiding place behind the cushions, and he pointed it at Wilson's head and mid-section. Wilson knocked Appellant's arm so that the gun pointed away from

her. Appellant then fired the gun multiple times into the couch and walls. Appellant spoke of killing himself. He told Wilson that he had only two bullets left and that he was going to his trailer, which was parked nearby, to get more. Appellant advised Wilson not to go near her pickup truck, but he told her she could go outside to smoke a cigarette. When Appellant walked out the door, Wilson grabbed her dog and ran from her home. She hid in heavy vegetation and cactus in the adjoining field. She heard Appellant start **[**6]** a truck, and he drove it towards Wilson. He stopped and revved the engine several times before backing up. Wilson saw Appellant drive away in her blue Dodge Dakota pickup truck. The license plate number was 21X-ZJ5. Wilson **[*463]** later found that her money and credit cards were missing from her purse. Investigators recovered .380-caliber bullets and shell casings from her home, and Wilson turned over Appellant's day planner, which contained a photocopy of Paula Griffith's driver's license.

Later that evening, Glenda Purcell was at her usual hangout, O'Neill's Sports Tavern in Marble Falls. Purcell had recently broken up with Appellant after a tumultuous six-month romantic relationship that ended when she asked him to move out of her home. Following the break-up, Purcell obtained a protective order against Appellant, of which Appellant had notice. Michael Allred was on duty as a bartender that night.

At approximately 8:30 p.m., Appellant entered O'Neill's Sports Tavern. He was dressed in what Purcell described as his "motorcycle attire": a black leather vest, chaps, a cap, and a jacket. Purcell immediately called out for someone to call the police because she had a protective order against Appellant. **[**7]** Appellant then walked over to Purcell, put his hand over her eyes, and held the gun to her head. He pulled the trigger several times, but the gun jammed. Purcell then ran back towards the men's room where Allred was repairing something. She yelled, "Mike, Mike, [Appellant's] here, he's got a gun." Allred stepped between Purcell and Appellant. Allred tried to persuade Appellant to calm down and to give him the gun, but Appellant then shot Allred in the chest with a .380-caliber bullet, severing his aorta and killing him. Purcell ran out of the back door to the police station next door. Witnesses saw Appellant flee the bar in a blue Dodge Dakota pickup truck with the license plate 21X-ZJ5. Appellant was headed in the direction of Jonestown.

Paula Griffith lived in a house in Jonestown with her fifteen-year-old daughter, Haylie Faulkner. Griffith previously dated Appellant, but they had not had a romantic relationship in some time. By all accounts, the break-up

Page 5 of 14

354 S.W.3d 457, *463; 2011 Tex. Crim. App. LEXIS 1669, **7

seemed amicable, and Appellant kept in touch with Faulkner, even paying her entry fee into some beauty pageants.

On the evening of August 24, Griffith, Faulkner, Faulkner's friend (Danielle Hensley), and Griffith's boyfriend (Jay [**8] Feltner) were at Griffith's home preparing for a trip to Fiesta Texas, an amusement park in San Antonio. Griffith had obtained tickets to celebrate the last weekend before the start of school. The group planned to travel to San Antonio on Friday night, spend the day at Fiesta Texas on Saturday, and return to Jonestown late Saturday night. Hensley was to return to her family's home in Leander on Sunday.

On that Friday evening, August 24, Hensley's mother and step-father began to worry when they did not receive a phone call from her because Hensley normally called to say good night. On Saturday, her parents were still unable to reach Hensley, Griffith, or Faulkner. They called the Jonestown police, but the police were unable to assist because the parents did not know the physical address of Griffith's house. When searching the internet for news of any auto accidents or other events that might explain Hensley's failure to make contact, Hensley's step-father learned about the murder in Marble Falls and that the police were looking for a blue Dodge Dakota pickup truck with the license plate number 21X-ZJ5.

On Sunday morning, August 26, Hensley's parents drove to Griffith's home in Jonestown. [**9] As they approached the driveway, Hensley's step-father saw a blue Dodge Dakota pickup truck parked near the house. He recognized the license plate number from his internet search the day before, and he knew that something was [*464] wrong. He parked a block away and called the police.

After securing the area, the police entered Griffith's home to check on the welfare of the people possibly inside and discovered the four bodies. Feltner had been shot in the head from close range while sitting at the kitchen table. Griffith had been shot in the back of her head, apparently while she was running from the living room. Faulkner had fallen to the living room floor with a gunshot wound to the head. Hensley, who was lying on the living room couch, had four gunshot wounds including a fatal wound to the head. The group had apparently been preparing dinner as raw meat sat out on the counter and the barbecue grill outside was open.

It appeared to the investigators that each of the females' purses had been searched and the contents dumped onto a couch. Feltner's duffle bag had also been searched, and his cell phone was discovered to be missing. A carton of Skydancer cigarettes was on the same couch, and [**10] a

cigarette butt was found on the floor. No identifiable fingerprints were found at the scene.

Police confirmed that the blue Dodge Dakota pickup truck parked at Griffith's home was the same one that had been used to flee the murder in Marble Falls. Investigators collected three Natural Light beer cans, one empty Sport cigarette package, cigarette butts from the ashtray, and a set of General Motor keys from the pickup. They also discovered that Griffith's white 2001 Saturn station wagon was missing.

Meanwhile, beginning Friday night, August 24, Appellant began calling his friend, Brinlee. During his first phone call, Appellant told Brinlee that he had "shot at" six people and "maybe killed two" people. He stated that he "was on the run." During the second call, Brinlee noticed that Appellant was not calling from his cell phone; he was now calling from a new number. It was later determined that Appellant was using Feltner's cell phone. This second call was placed at 11:44 p.m. in the vicinity of a cell tower in Belton, Texas.

During his second or third phone call to Brinlee, Appellant said that "he was going after [Purcell] and her father and mother." He told Brinlee that he had gone to [**11] the bar to kill Purcell, but the bartender got in the way. Appellant said that he took a couple of shots at Purcell, but the gun jammed and that was why Purcell was not dead.

Records for Wilson's credit card showed that someone attempted to use it at a Round Rock gas station on August 24. Call records for Feltner's phone showed points along the route that Appellant took as he fled Texas. In addition to the call from the Belton area, Appellant used the phone while he was near the following locations: Mount Sylvan, Texas (Saturday, August 25 at 3:17 a.m.); Okalona, Arkansas (Saturday, August 25 at 9:12 a.m.); Bakerville, Tennessee (Saturday, August 25 at 3:30 p.m.); Shippensburg, Pennsylvania (Sunday, August 26 at 2:40 p.m.); and Siperstein Plaza, New Jersey (Sunday, August 26 at 6:46 p.m.). Appellant was traveling to his mother's home in Shirley, New York.

On Sunday, August 26, while Appellant was driving through Pennsylvania, Griffith's Saturn station wagon began stalling and "riding rough." Appellant decided that he needed a different car, so he left Interstate 81 in the town of Greencastle. Appellant spotted a "nice car" in a driveway. Armed with the gun, he entered the home of Betty [**12] DeHart and found the keys to her blue 2006 Hyundai Elantra. He [*465] transferred his items from Griffith's car into the Hyundai, including a Walmart bag containing ammunition, Skydancer cigarettes, sunglasses, and a road

Page 6 of 14

354 S.W.3d 457, *465; 2011 Tex. Crim. App. LEXIS 1669, **12

map. Appellant then continued driving to New York. An expended .380-caliber bullet and shell casing were recovered from DeHart's home. In Griffith's Saturn station wagon, investigators found an identification badge for Griffith, a certificate of Faulkner's participation in a beauty pageant, a paper towel holder, a peanut can, and Powerade, Dr. Pepper, and Coca-Cola bottles.

Around noon on Monday, August 27, Appellant was located at the home of his friend and former employer, Gerald Baldoni, in the Long Island town of Shirley, New York. Baldoni invited the initial officer into his home and told him that Paul was there. The officer called for back-up, and when the officers subsequently entered the home, Appellant came out into the hallway from a bedroom with the gun pointed to his head. Appellant asked the officers to call his mother. He also stated that he did not want to go to jail for what he did because he knew that he was going to spend a long time there. After a short **[**13]** stand-off, Appellant threw down his weapon and surrendered.

Investigators recovered the gun, which had a bullet in the chamber and a loaded magazine. They also recovered Appellant's black cowboy boots, leather vest, cap, and other clothing, and inside the vest's pocket, they discovered Wilson's credit card, a loaded magazine, loose shells, a Bic lighter, a pocket knife, a business card, and a piece of paper with a cell phone number written on it. DeHart's Hyundai was found parked at Baldoni's home; the keys were found in the house. Inside the Hyundai, they recovered Feltner's cell phone and the Walmart bag, which contained a box of 100 Winchester .380-caliber bullets, an open carton of Skydancer cigarettes, a pair of sunglasses, a road atlas with the area around DeHart's home circled in ink.

Pending his extradition to Texas, Appellant was held in custody by the Suffolk County, New York Police Department. Appellant made the following unsolicited statements in the presence of an officer: "They're going to extradite me back to Texas, then probably Tennessee, West Virginia, Pennsylvania, then probably back here. I bet they found me when I turned my damn cell phone on. I had that bitch turned **[**14]** off the whole time and they didn't have a clue where I was"; "I had a good fucking thing going on in Texas, too. Business, house, vehicles. If it wasn't for my stupid fucking girlfriend. One mistake ruined my whole fucking life"; "Do you know how many bodies they found? Five, six in Texas. Maybe 12 bodies." Appellant also spoke with a detective of the Suffolk County Police Department. He described many of the events surrounding the instant offenses, but he did not speak specifically about the acts of shooting or killing.

After his return to Texas, Appellant told a cellmate in the Travis County Jail, "I'll be here for a long time . . . I killed six people." Also while in jail, during a recorded conversation with an acquaintance, Tiffany Waldrop, Appellant told Waldrop that he thought that he would be in jail for "[l]ife. I'm getting the death penalty." When Waldrop asked Appellant if he had spoken with Brinlee, Appellant responded, "I've talked to [Brinlee], oh, they don't want him basically him [sic] talking to me right now . . . . Because it was [Brinlee]'s gun that I used." Appellant also told Waldrop, "I just wish I had never had that gun."

DNA analysis identified Feltner's and Allred's **[**15]** blood on Appellant's boots. Appellant's DNA was on a cigarette butt **[*466]** found at the Jonestown crime scene and on Dr. Pepper and Coca-Cola bottles left in Griffith's Saturn station wagon. A DNA profile consistent with a mixture of Appellant's and Faulkner's DNA was found on a Gatorade bottle also left in the station wagon. Ballistics analysis determined that the bullets recovered from the Llano, Marble Falls, Jonestown, and Pennsylvania crime scenes were all fired from Brinlee's .380-caliber pistol.

The evidence presented at punishment revealed that Appellant shot and killed 81-year-old Betty DeHart when he stole her blue Hyundai in Greencastle, Pennsylvania. DeHart was found lying on her bed with a close-range gunshot wound to the head. Appellant claimed to have chased her into her home and that he shot her because "she wouldn't stop screaming."

Appellant possessed a lengthy criminal history. He was incarcerated in Burnet County, Texas, for various misdemeanors. Before that, he was jailed in Suffolk County, New York, over twenty times between 1980 and 2004, including an incarceration in the Gowanda state prison from 1997 to 2002. Appellant's convictions in Suffolk County, New York, included **[**16]** aggravated unlicensed operation of a motor vehicle, aggravated harassment, criminal trespass, disorderly conduct, endangering the welfare of a child, two convictions for harassment, three for assault, and four for felony driving while intoxicated. Appellant's 1989 assault conviction was for shooting another young man with a 12-gauge shotgun following an altercation that Appellant incited; that man testified about that incident and his resulting wounds.

Appellant also had a lengthy history of abusing women. Appellant told a former neighbor that he "liked to slap the girls around." Purcell, the woman Appellant attempted to kill in Marble Falls, testified about earlier abuse by Appellant. On one occasion, he punched her in the face and

Page 7 of 14

354 S.W.3d 457, *466; 2011 Tex. Crim. App. LEXIS 1669, **16

broke her nose. On another occasion occurring June 15, 2007, while driving, she and Appellant were run off the road. Appellant chased down the offending truck, forced it to stop, and pulled the driver—a young woman—out of the truck. He threatened to beat up the young woman, but Purcell persuaded him not to do so. Later that same night, Purcell complained that Appellant had been living in her home for four months without paying any bills or helping out. Appellant **[**17]** became angry, and he cut Purcell's clothes off with a knife, punched her several times, and held a knife to her throat. He also hit Purcell with the finial from a bed post, breaking two of her ribs, and he threatened to shoot her. Purcell subsequently kicked Appellant out of her home and obtained a protective order.

Jody Pagel, a woman whom Appellant had dated in the early 1980s while living in New York, testified regarding three incidents involving Appellant. During the first incident, Appellant drank too much and attempted to choke her to death. Pagel testified that the second incident occurred in the house, but she could not recall the facts clearly. During the third incident, they were at a bar when Appellant choked Pagel so hard that he lifted her up off the floor; he then threw her to the ground. Following the assault, Appellant sat at the bar with another woman as if nothing had happened. After Pagel broke up with Appellant, Appellant made harassing phone calls in which he threatened to kill Pagel and her new boyfriend. Pagel reported the calls, and she obtained a protective order.

On December 20, 2006, Appellant went to the emergency room at South Austin Medical Center. When **[**18]** a female physician told him that it would not be a good idea for him to leave the hospital, Appellant **[*467]** spoke aggressively and abusively to someone on the phone and then threatened to physically harm the female doctor.

Mary McNellage testified that Appellant lived in her Spicewood, Texas, home for 89 days. She wanted him to leave due to his lies, drinking, and uncontrolled behavior. McNellage did not want to ask Appellant directly to leave because Appellant had previously physically threatened her. Consequently, she left him a car and a suitcase along with a note that asked him to leave her things alone and "just go." She had also washed and folded his clothes and had packed them and his other belongings in the suitcase and car. McNellage then stayed at a friend's house for 13 days because she was afraid of Appellant's reaction to the note. Appellant refused to leave, but eventually he was forced to go. After McNellage finally returned home, Appellant showed up around 3:00 a.m. saying that he wanted to have sex with her. When she rebuffed his advances, Appellant held a hunting knife to her throat. She managed to fight Appellant off and call 9-1-1. Charges were filed against Appellant, **[**19]** and the case was pending at the time of the capital murders.

Appellant's family confirmed that, when Appellant was in his twenties, he once attempted to strangle his mother with a telephone cord. Following that incident, Appellant's mother obtained a protective order against him.

The jury also received ample evidence from numerous witnesses that Appellant abused alcohol and drugs and that he tended to become more violent when he did so. Appellant's mother testified, via deposition, that Appellant became "very violent" when he was drinking—he "would take things apart, tear up the house, and break down doors. He would act like that no matter whose house he was at."

Appellant's substance abuse was also the subject of expert testimony. Defense psychiatrist Dr. Robert Cantu interviewed Appellant. His understanding from Appellant was that Appellant had smoked a half to one ounce of methamphetamine in the 12 hours preceding the instant offense, in addition to drinking what Appellant reported as a liter of rum that day. Cantu testified that Appellant would be a danger to others in prison if he had access to large quantities of drugs or alcohol, if he had the opportunity to harm weaker people **[**20]** there, and if he were in an unstructured environment that allowed him to go places without direct supervision. Cantu stated, "I think if those three things . . . were present, that he would be a future danger, yes, sir." Cantu also believed that Appellant did "know what he was doing" during the time of the instant offense.

A.P. Merillat, a senior criminal investigator for the Texas Special Prosecution Unit, testified that inmates in Texas prisons have access to drugs, alcohol, and weapons. He further testified that many violent crimes occur inside Texas prisons.

Dr. Richard Coons, a psychiatrist, testified for the State without objection. After interviewing Appellant and reviewing his records, Coons agreed with Cantu's assessment that Appellant would be a continuing threat to society. In Coons's opinion, Appellant was "drug dependent and . . . I think if he were given the opportunity, [Appellant] would certainly try to get them, try to use them" in prison. During Coons's interview with him, Appellant described the instant offenses in detail. Appellant told him that he was angry when he shot the gun in Wilson's home, but he said that the shooting of Allred "was an accidental shooting." **[**21]** He

Page 8 of 14

354 S.W.3d 457, *467; 2011 Tex. Crim. App. LEXIS 1669, **21

claimed that he went to Griffith's home to get money and that he shot Feltner because Feltner came at him (despite the physical evidence that **[*468]** Feltner was seated at the kitchen table). He shot Griffith and the kids because they were screaming. He also stated that he shot DeHart because she was screaming.

Coons concluded that Appellant was not operating under any type of psychosis during the instant offense. He found that Appellant planned his behavior and was "actively responsive to what he [felt] he need[ed] to do." Coons agreed with Appellant's previous diagnoses of psychotic disorder not-otherwise-specified, antisocial behavior, and personality problems, and that Appellant is polysubstance dependent.

In reaching a determination that Appellant would be a future danger, Coons evaluated the following factors: (1) Appellant's long history of violence; (2) the awful set of facts related to the instant offense; (3) Appellant's attitude toward violence, which is impulsive with a lack of empathy; (4) Appellant's antisocial personality behaviors; (5) Appellant's lack of any remorse; and (6) the prison society that Appellant would be in.

The defense's expert, psychologist Dr. Ollie Seay, evaluated **[**22]** Appellant for mental retardation and concluded that Appellant did not fit the criteria for that diagnosis. Seay did testify, however, that he believed that Appellant may have "possible mental limitations." Neuropsychologist Dr. Leslie Rosenstein surmised that Appellant has deficits and weaknesses in his neurocognitive functioning, but she agreed that Appellant was not legally mentally retarded.

Appellant's aunt, Laura Nelson, and sister, Elizabeth Petrie, testified on his behalf. Nelson stated that she did not think Appellant was treated well by his step-father and that he seemed to be punished a lot. Her memories of Appellant are of a caring, loving, and sharing person. However, Nelson admitted that she had not seen Appellant in several years. She knew that he had relationships with numerous women, that he would live off of them, and that the relationships ended because of fighting.

Petrie testified that Appellant was a typical brother, but he did "smack" her and physically push her while they were growing up. She noted that Appellant did not do well in school and that he started drinking when he was fifteen. She was aware that her brother could be "very violent" and that his relationships **[**23]** with women frequently involved violence. Appellant called Petrie while he was "on the run" in the instant offense, and he told her that he had shot people and did not know if they were alive or dead. Petrie told Appellant to turn himself in and not to hurt anyone else; he responded, "I gotta do what I gotta do." Appellant also presented evidence that he did not have a record of disciplinary problems during his many incarcerations.

On appeal, Appellant's argument centers on the weight that should be given to his "pristine" behavioral record while incarcerated. However,*HN4* while good behavior in prison is a factor to consider, it does not preclude a finding of future dangerousness. See *Emery v. State, 881 S.W.2d 702, 707 (Tex. Crim. App. 1994)*. We have held that this Court can review the objective evidence of future dangerousness, but we do not engage in reviewing the jury's normative decision on mitigation. *Young, 283 S.W.3d at 865*; *Colella v. State, 915 S.W.2d 834, 845 (Tex. Crim. App. 1995)*. Therefore, we conclude that there was sufficient evidence to support the jury's affirmative finding on the future dangerousness issue, and we defer to the jury's conclusion that the mitigating evidence **[**24]** was not sufficient to warrant a sentence of life imprisonment. Point of error eight is overruled.

In point of error one, Appellant claims that the trial court erred in allowing **[*469]** him "to be tried on copious amounts of extraneous offense evidence" at guilt in violation of *Texas Rule of Evidence 404(b)*, thereby denying him a fair trial. Specifically, he complains that the trial court improperly permitted the State to present extraneous offense evidence pertaining to the theft of Brinlee's gun, the aggravated assault of Wilson in Llano, the killing of Allred in Marble Falls, and the robbery of DeHart in Pennsylvania.[2] Appellant concedes that the murders of Griffith and Feltner constitute same-transaction contextual evidence.

*HN5* Evidence of extraneous offenses is not admissible at the guilt phase of a trial to prove that a defendant committed the charged offense in conformity with a bad character. *Tex. R. Evid. 404(b)*; *see* *Nobles v. State, 843 S.W.2d 503, 514 (Tex. Crim. App. 1992)*. However, extraneous offense evidence may be admissible when it has relevance apart from character conformity. *Moses v. State, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003)*. **[**25]** For example, it may be admissible to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id*. Evidence of another crime, wrong, or act also may be admissible as same-transaction contextual evidence where "several crimes are intermixed, or blended

---

[2]    As noted previously, evidence of DeHart's murder was not presented during the guilt phase of trial.

Page 9 of 14

354 S.W.3d 457, *469; 2011 Tex. Crim. App. LEXIS 1669, **25

with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, . . ., of any one of them cannot be given without showing the others." *Wyatt v. State, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000)* (quoting *Rogers v. State, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993))*. The jury is entitled to know all relevant surrounding facts and circumstances of the charged offense. *Id*. But, under *Rule 404(b)*, same-transaction contextual evidence is admissible only when the offense would make little or no sense without also bringing in that evidence, and it is admissible "only to the extent that it is necessary to the jury's understanding of the offense." *Id*. (quoting *Pondexter v. State, 942 S.W.2d 577, 584 (Tex. Crim. App. 1996))*.

*HN6* "Whether extraneous offense evidence has relevance apart from character conformity, as required by *Rule 404(b)*, is a question **[**26]** for the trial court." *Moses, 105 S.W.3d at 627*. Thus, a trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse-of-discretion standard. *Prible v. State, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005)*; *see Santellan v. State, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997)*. As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the trial court's ruling will be upheld. *Prible, 175 S.W.3d at 731*; *Santellan, 939 S.W.2d at 169*. A trial court's *404(b)* ruling admitting evidence is generally within this zone if there is evidence supporting that an extraneous transaction is relevant to a material, non-propensity issue. *Powell v. State, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001)*; *see Santellan, 939 S.W.2d at 169*. If the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed, even if the trial judge gave the wrong reason for his correct ruling. *Sewell v. State, 629 S.W.2d 42, 45 (Tex. Crim. App. 1982)*.

At a pre-trial hearing, the State presented evidence that the charged offense and the extraneous offenses at issue were all part of a single "crime **[**27]** spree." The State argued that each of the episodes in the **[*470]** instant case, beginning with the burglary of a habitation and the theft of Brinlee's gun and ending with the robbery of DeHart, constituted one continuous episode because these extraneous offenses were necessary to properly explain what happened in Jonestown and to clarify the nature of the crime alleged. Although the State argued that it had no direct evidence that Appellant committed the Jonestown murders, they presented the evidence of each extraneous offense to prove the charged crime and to illustrate the "crime spree" characterization of Appellant's acts. Further, omitting the extraneous offenses would make little or no sense and would be impractical because they are needed to tie Appellant to the crime. The trial court agreed, concluding

that "[t]he evidence is so intermingled between all of the events that occurred it would just -- it would be impossible to do so without leaving a hole, leaving a gaping hole in the State's case. So the Court does find that this is one continuing course of conduct[.]" In a subsequent pre-trial hearing, the trial court reaffirmed its ruling.

We conclude that the trial court did not err. **[**28]** It was within the zone of reasonable disagreement to find the various offenses to be contextual evidence. Appellant did not rest between incidents, and the charged offense would make little sense without the extraneous offenses. The extraneous offense evidence presented showed that Appellant went to homes and establishments where he knew certain women would be found (with the exception of DeHart), specifically women with whom he had a personal relationship. Appellant deliberately stole a gun from the home of his friend Brinlee. After threatening Wilson with the gun and shooting it inside her home, Appellant stole Wilson's truck and one of her credit cards. He then drove Wilson's truck to O'Neill's in Marble Falls. There, all of the witnesses saw Appellant with the gun when he used it in an attempt to kill Purcell and in the murder of bartender Allred. All witnesses testified that no one else ever fired or possessed the gun. Appellant was seen fleeing Marble Falls alone in Wilson's stolen blue truck, and that very truck was present at the Jonestown crime scene. This, along with ballistics evidence and DNA evidence, created more circumstantial evidence to establish the identity of Appellant **[**29]** as Faulkner's and Hensley's killer. The abandonment of Wilson's blue truck and the theft of Griffith's white Saturn were also part of this continuing episode.

Further, the theft of DeHart's blue Hyundai occurred during Appellant's flight from the instant offense as he attempted to travel to his mother's home in Shirley, New York. *HN7* "[F]light is admissible as a circumstance from which an inference of guilt may be drawn." *Alba v. State, 905 S.W.2d 581, 586 (Tex. Crim. App. 1995)*. And if "the extraneous offense is shown to be a necessarily related circumstance of the defendant's flight, it may be admitted to the jury." *Id.; see also Foster v. State, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989)*. Appellant was apprehended in Suffolk County, New York with DeHart's vehicle, the gun, Feltner's cell phone, and Wilson's credit card. The trial court did not err in holding that the instant offense was not fully understandable without the contextual evidence of the extraneous offenses.

We note that Appellant contends that, because "no one was challenging the State's version of events," the introduction of the extraneous crimes was unnecessary to prove identity

Page 10 of 14

354 S.W.3d 457, *470; 2011 Tex. Crim. App. LEXIS 1669, **29

or any of the other *Rule 404(b)* exceptions. **[\*\*30]** This argument is without merit. Appellant did not plead guilty, and he argued at closing against a finding of guilt. **HN8** When the identity of the perpetrator can be established by circumstantial **[\*471]** evidence only, identity is a contested issue even if the defense rests with the State, puts on no evidence, and raises no defensive theories. *See Jones v. State, 568 S.W.2d 847, 858-60 (Tex. Crim. App. 1978)*. We also note that this argument is without merit because, aside from the identity issue, the State needed all of this evidence to give context to Appellant's "crime spree" as he stole the gun to go after women with whom he had had personal relationships and to then effectuate his flight to his mother's home. Point of error one is overruled.

In point of error two, Appellant argues that the trial court erred in "failing to give an individual limiting instruction as to each piece of extraneous offense evidence at the time it was admitted, denying him a fair trial." The record shows that the trial court denied Appellant's numerous requests for individual *Rule 404(b)* limiting instructions. However, at the end of trial, the trial court agreed to include a limiting instruction in the court's charge **[\*\*31]** regarding the extraneous offenses that were admitted.

This Court has held that **HN9** a limiting instruction is not required when evidence is admitted as same-transaction contextual evidence. *Castaldo v. State, 78 S.W.3d 345, 352 (Tex. Crim. App. 2002)*; *Wesbrook v. State, 29 S.W.3d 103, 114-15 (Tex. Crim. App. 2000)*. Because we hold that the trial court did not err in admitting the extraneous offense evidence as same-transaction contextual evidence, no instructions were required. Moreover, even though not required, the trial court included in the jury charge a limiting instruction on extraneous-offense evidence. Appellant's second point of error is overruled.

In his third point of error, Appellant contends that the trial court "erred in failing to grant [him] a new trial, where prosecutor Gary Cobb threw one or more boxes of live rounds of ammunition into the jury box prior to the jury retiring to consider punishment." The record shows that after the jury retired to begin its deliberations, the following occurred:

> MR. WEBER [Defense Counsel]: All right. We're going to object to Mr. Cobb's conduct during early in the presentation -- early in the closing. He picked up live rounds, not shells, **[\*\*32]** and poured -- from about a foot high poured -- where is [Mr. Erickson, defense counsel] -- I would say 50 rounds of ammunition on the bench directly in front of the jurors.

And how many are in the jury box right now?

MR. ERICKSON: About 12.

MR. WEBER: There's 12 rounds that actually went into the jury box, live rounds.

How many are on the bench in front of them?

MR. ERICKSON: 15.

MR. WEBER: There's 15 on the bench in front of them.

He poured live rounds in front of the jury. He then walked over and held the gun out to [Appellant] and offered the gun to [Appellant]. He then brought records that I introduced that were in the record and slammed them down on the table directly in front of me.

All of these actions violated the specific rules the judge told us and proper conduct. [The judge] gave us the rules. We all acknowledged we heard it. Absolutely improper. Absolutely outrageous conduct. Absolutely uncalled for.

We have no problem with anything that was said against us, but this conduct was just completely outside the bounds of what is permitted in the law.

 **[\*472]** We ask, one, that Mr. Cobb be held in contempt of court; and we ask, two, for a mistrial.

THE COURT: Counsel has requested that that be placed **[\*\*33]** on the record. And, State, if you wish to reply as well on the record, you may do so.

MR. COBB: Only to dispute Mr. Weber's accusation that I offered the gun to [Appellant]. I did not offer the gun to [Appellant]. I walked toward counsel['s] table with the gun. And I don't believe that I slammed the records down. I did put them on counsel['s] table.

The trial court declined to hold the prosecutor in contempt and denied Appellant's motion for mistrial.

Appellant did not object to the prosecutor's conduct or request an instruction to disregard when the conduct occurred, but instead moved for a mistrial after the jury had already retired to begin its deliberations. In so doing, Appellant failed to object at the earliest opportunity, and thus, he has preserved nothing for our review. *Tex. R. App. 33.1(a)*. Point of error three is overruled.

In point of error four, Appellant contends that the trial court erred in failing to grant him a new trial where the State singled out Catholics for exclusion from the jury panel in

Page 11 of 14

354 S.W.3d 457, *472; 2011 Tex. Crim. App. LEXIS 1669, **33

violation of *Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)*.[3] He avers that this is a case of first impression and asks this Court to reverse and remand his case for a new trial. Appellant **[**34]** is incorrect.

We addressed this same issue in *Casarez v. State*, 913 S.W.2d 468, 495 (Tex. Crim. App. 1994) (op. on reh'g). *HN10* In holding that *Batson* challenges do not apply to peremptory strikes based upon religion, we stated that, by definition, a religious belief (unlike race or gender) is a subscription to a set of beliefs and convictions. *Id*. Strikes based on personal belief have long been recognized as appropriate and are, in fact, the foundation of the entire voir dire process. *Id*. In discussing the difference between striking jurors on the basis of race or gender versus religion, we stated,

> Attributing to women or African Americans as a group any specific moral, political, or social belief is overly broad because membership in the group does not depend upon subscription to the belief. It is invidious because individual members who do not share the belief are made to suffer the attribution anyway. **[**35]** But in the case of religion, the attribution is not overly broad, and therefore not invidious, when the belief is an article of faith. Because all members of the group share the same faith by definition, it is not unjust to attribute beliefs characteristic of the faith to all of them.

*Id*. at 496. Appellant raises nothing to persuade us to revisit our holding in *Casarez*. Point of error four is overruled.

In Appellant's fifth point of error, he claims that the evidence is insufficient to demonstrate that he would be a future danger in prison and that the testimony concerning the ″incompetency″ of TDCJ (*i.e*., TDCJ's failure to protect its inmates from drugs, alcohol, and violence) violated his right to individualized sentencing. Appellant concedes in his reply brief that this fifth point of error is redundant of points of error eight and nine. He asks that the argument and authority contained in point **[*473]** five be incorporated into point of error nine and that point of error five no longer exist as a separate point of error. We will grant Appellant's request.

In point of error six, Appellant claims that it is unconstitutional to sentence a mentally ill person to death.

Appellant asserts that **[**36]** the testimony of his mental-health experts shows that he has borderline intellectual functioning; he also notes that he was held to be incompetent to stand trial prior to the restoration of his competence and subsequent trial. Citing *Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002)* (banning the execution of mentally-retarded offenders), and *Roper v. Simmons, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)* (banning the execution of juvenile offenders), he argues that these decisions should be extended to protect the mentally ill from execution. Appellant concedes that he is not mentally retarded or a juvenile.

We recently addressed this issue in *Mays v. State, 318 S.W.3d 368, 379-80 (Tex. Crim. App. 2010)*. Quoting our previous caselaw, we stated that *HN11* ″there is no authority from the Supreme Court or this Court suggesting that mental illness that is a 'contributing factor' in the defendant's actions or that caused some impairment or some diminished capacity, is enough to render one exempt from execution under the *Eighth Amendment*.″ *Id. at 379*. As in *Mays*, Appellant cites no cases from any American jurisdiction that hold that the *Atkins* rule or rationale applies to the mentally ill. *See id*. Nor has he demonstrated that there **[**37]** is a trend among state legislatures to categorically prohibit the imposition of capital punishment against mentally ill offenders. *See id*. Finally, Appellant fails to show that, if he did suffer from some mental impairment at the time of these murders, his impairment was so severe that he is necessarily and categorically less morally culpable than those who are not mentally ill. *See id. at 379-80*. As Appellant has raised nothing new to persuade us to revisit our previous decision, we overrule point of error number six.

In point of error seven, Appellant avers that the trial court erred in not allowing the defense to question venire person Jacqueline Lambert prior to her being struck for cause. Appellant argues that it was unconstitutional under *Witherspoon v. Illinois, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968)*, and *Wainwright v. Witt, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985)*, to prevent him from attempting to rehabilitate a potential juror who had qualms against the death penalty.

During voir dire questioning by the State, Lambert stated that she was opposed to the death penalty under any circumstances and that she could not set aside her principles and follow the law. When the State asked if she would still

---

[3] During voir dire, Appellant challenged the prospective jurors' exclusion under *Batson* based upon the jurors' religion. While Appellant notes that each of the five prospective jurors was a minority, he did not assert at trial, or on appeal, that the State excluded these jurors because of race.

Page 12 of 14

354 S.W.3d 457, *473; 2011 Tex. Crim. App. LEXIS 1669, **37

vote for a life sentence **[**38]** no matter how horrible the crime, Lambert responded as follows:

A. Yes, I know. I know because I know -- I know it's a horrible crime and I know. And I don't mean to -- I mean, like the judge said, this is the time that I can speak. We didn't get down to the next section [of the questionnaire], which I think has a lot of bearing on my case, on my feelings being here also, is that I live out on the North Shore. I know what a horrible thing this was because it was in the papers, and I know -- and at the time I read everything. We had just moved there. It was just horrible.

And when I -- when the judge asked when I was here before, I thought I could really be objective in this case, but I drove home that day and I went through Jonestown, which I do every **[*474]** day, in and out, and I thought I just don't know that I could be as objective as I thought I could. And I feel really bad about this.

So, it's not just my indecision -- not indecision, but my feeling on the death penalty. My other thing is that I live in that area where there are a lot of other people that were impacted by this.

Lambert went on to note that at the time of the murders, she discussed the case with other people in the area and **[**39]** read extensively about the case. She stated that all of the information that she had received had caused her to form an opinion regarding Appellant's guilt and that it would interfere with her ability to sit on the jury.

After the State passed the prospective juror, the trial court questioned Lambert:

Q. [THE COURT]: Let me ask the question in the way we need to have it asked. Based on the information that you have heard in the media or read in the media, have you formed an opinion as to the guilt or the innocence of the defendant in this case?

A. Yes.

Q. Would that opinion that you have formed as to his guilt or innocence affect your verdict?

A. Yes.

The trial court excused the juror.

Appellant objected to Lambert's excusal, arguing that the State did not properly prove the reason for her excusal under *Article 35.16* and that the defense had no opportunity to rehabilitate her. The trial court explained,

Frankly, I think the law says that once she answers the pretrial publicity question, which I have an obligation, the Court can on its own motion ask that question once there are facts that indicate that the juror may have a bias or prejudice, which I think the State was attempting to do. But **[**40]** if it was not asked in the right form for the record, I think the Court has an obligation to do so.

And I think the law says, since you-all are so familiar with [*article] 35.16* and of the sections [sic], that once she answers that question in such a way that it indicates that her verdict would be affected, that we can question her no more.

In response to Appellant's objection, the State moved Lambert be struck for cause. The trial court granted the State's challenge for cause, noting, "I'm doing what [*article] 35.16* mandates that has to be done once her answer is clear."

*Article 35.16(a)(10)* states, in pertinent part, that a juror may be struck for cause for the following reason:

*HN12* That from hearsay, or otherwise, there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence the juror in finding a verdict. To ascertain whether this cause of challenge exists, the juror shall first be asked whether, in the juror's opinion, the conclusion so established will influence the juror's verdict. *If the juror answers in the affirmative, the juror shall be discharged without further interrogation by either party or the court.*

(Emphasis **[**41]** added). Following the State's questioning of Lambert, the trial court had the discretion to clarify Lambert's position by asking further questions. *See Heiselbetz v. State, 906 S.W.2d 500, 510 & n.13 (Tex. Crim. App. 1995)*. Once clarified, however, any further questioning was proscribed by statute. *Id. at n.13*. Accordingly, the trial court did not abuse its discretion in dismissing Lambert.

We also note that Appellant's reliance on *Witherspoon* and *Witt* is misplaced. As **[*475]** summarized by Appellant, *Witherspoon* and *Witt* stand for the proposition that a defendant has the "right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." *See Witherspoon, 391 U.S. at 521-23*; *Witt, 469 U.S. at 418-21*. Here, Lambert was not discharged because of her opposition to the death penalty, but rather because she clearly indicated that her conclusion as to Appellant's guilt or innocence

Page 13 of 14

354 S.W.3d 457, *475; 2011 Tex. Crim. App. LEXIS 1669, **41

would influence her verdict. The trial court did not err in excusing Lambert without additional questioning. Point of error seven is overruled.

In point of error nine, Appellant complains that "a large portion of the State's case at punishment [**42] was unfair because it concerned factors outside of Appellant's control or unrelated to Appellant's personality." Citing *Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978)*, Appellant complains that testimony concerning the "incompetency" of TDCJ (*i.e.*, TDCJ's failure to protect its inmates from drugs, alcohol, and violence) violated his right to individualized sentencing under the *Sixth*, *Eighth*, and *Fourteenth Amendments*.

Appellant argues, in both his brief and his reply brief, that he was denied individualized sentencing "mostly due to the testimony of A.P. Merillat, which holds [Appellant] responsible for TDCJ's total incompetence in keeping anybody who enters its doors safe." Evidence at both the guilt and punishment phases showed that Appellant used drugs and alcohol and that he was more violent when he did so. At punishment, Merillat, a senior criminal investigator for the Texas Special Prosecution Unit, testified that inmates in Texas prisons have access to drugs, alcohol, and weapons. He further testified that many violent crimes occur inside Texas prisons both in the general population and on death row. Merillat noted that he knew nothing about Appellant or his case, and that he was [**43] not opining as to whether Appellant would be a future danger.

Appellant did not object at trial to the admission of the complained-of evidence on constitutional or other grounds. Therefore, he presents nothing for our review. *Tex. R. App. 33.1(a)*. Further, even if Appellant preserved error, we have previously rejected similar arguments. *See Jenkins v. State*, 912 S.W.2d 793, 818 (Tex. Crim. App. 1995) (on motion for reh'g) (determining that "evidence about the availability of drugs in prison was relevant to show appellant could be just as dangerous in prison society as he is in nonprison society where drugs are freely available"); *see also Coble, 330 S.W.3d at 287-89* (rejecting the appellant's claim that the trial court erred by admitting Merillat's testimony about the Texas prison-classification system and violence in prison).

Appellant also complains that Dr. Richard Coons testified, based upon a two-hour interview with Appellant, that Appellant blamed "the gun" for the crime, and that there is a "ready availability of weaker victims" in the prison system. Citing *Coble*, he argues that this Court has found

that "Coons is not competent to testify as an expert witness on future dangerousness, [**44] which his own profession does not recognize, in a capital murder case at punishment because his testimony is unreliable under the *Eighth Amendment*." *See Coble, 330 S.W.3d at 270-79*.

The record shows that Appellant filed a pre-trial motion for a *Daubert*[4] hearing. [*476] However, no hearing was held. The motion did not specify any expert to which it was directed. Appellant also made no objections at trial to Coons's qualifications or competency as an expert; nor did he make any constitutional challenges regarding the admission of Coons's testimony. Appellant does not present any argument on appeal as to why Coons was not competent to testify in this case. Therefore, Appellant has preserved nothing for this Court to review. *Tex. R. App. 33.1(a)*. We also note that Appellant misquotes our opinion in *Coble*. We did not hold that Coons's testimony in *Coble* violated the Eighth Amendent; rather, although Coons's testimony was not sufficiently reliable under *Texas Rule of Evidence 702*, we held that its admission was not harmful as it did not affect the appellant's substantial rights to a fair sentencing trial. *Coble, 330 S.W.3d at 287*. We further noted that the Supreme Court has held that future dangerousness [**45] expert testimony such as that provided by Coons meets the "heightened reliability requirement of the *Eighth Amendment*." *Id. at 270* (citing *Barefoot v. Estelle, 463 U.S. 880, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983))*.

We further note that, even if the trial court had erred in admitting Coons's testimony, Appellant's substantial rights to a fair sentencing trial were not violated. Unlike in *Coble* where Coons had lost his notes documenting his interview with the defendant and had no independent memory of that interview, here Coons interviewed Appellant and based his opinion regarding future dangerousness upon that interview in addition to pertinent records regarding Appellant and this case. *See Coble, 330 S.W.3d at 278-79*. Moreover, Coons's future dangerousness opinion was similar to the opinion of Appellant's own expert, psychiatrist Dr. Robert Cantu. Cantu testified that if Appellant (1) had access to large amounts of drugs or alcohol, (2) had the opportunity to harm someone weaker than himself, and (3) was in a relatively unstructured environment, then Appellant would be a future danger in prison. Further, both experts agreed with the diagnosis that Appellant [**46] has "intermittent explosive disorder." As set forth in point of error eight, above, even without Coons's testimony, there was ample evidence that there was a probability that Appellant would commit future acts of violence. Finally, the State mentioned, but did not

---

[4]   *Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).*

Page 14 of 14

354 S.W.3d 457, *476; 2011 Tex. Crim. App. LEXIS 1669, **46

emphasize, Coons's complained-of testimony during closing arguments. Point of error nine is overruled.

We affirm the trial court's judgment.

Hervey, J.

Delivered: December 14, 2011

Publish